## SOUTHERN PAC. CO. v. HALL.

(Circuit Court of Appeals, Ninth Circuit. February 5, 1900.)

### No. 549.

1. EVIDENCE—ADMISSIBILITY OF MAPS.

In an action for a personal injury, a map or diagram of the place where the injury occurred, with its surroundings, shown to be substantially correct, is admissible in evidence, to aid the jury in understanding the testimony of the witnesses.

2. CARRIERS—ACTION FOR INJURY TO PASSENGER—EVIDENCE.

In an action by a passenger against a railroad company to recover for an injury caused by plaintiff's stepping into an uncovered box, set in the ground, on alighting from a train at a station in the darkness, the admission of evidence to show the place where the train usually stopped was not error, where there was also testimony that on the occasion of the injury it stopped at the usual place.

3. DAMAGES—PERSONAL INJURY—EVIDENCE.

In an action for a personal injury, evidence to show plaintiff's previous business or occupation is admissible on the question of damages, although such occupation was not alleged in his pleading.

4. EVIDENCE—SUBJECTS OF EXPERT TESTIMONY—EFFECT OF INJURY.

In an action for a personal injury which necessitated the amputation of plaintiff's foot, it was shown that his previous occupation had been

in working either as a carpenter or a miner, and also that he had procured an artificial foot. *Held*, that the effect of the injury, under such state of facts, on his capacity to labor at such occupations, was not so clearly a matter within the common knowledge of all men as to render it error to permit a physician to state his opinion on the subject.

5. DAMAGES—PERSONAL INJURY—SPECIAL DAMAGES.
    The cost of an artificial limb purchased in consequence of the injury sued for, which necessitated the amputation of plaintiff's foot, is not recoverable under a general allegation of damages, but must be alleged as special damages, to render proof thereof admissible.

6. NEGLIGENCE—ACTION FOR PERSONAL INJURY—EVIDENCE.
    Evidence that, after plaintiff was injured by falling into a sunken box at defendant's railroad station, such box was removed, is not admissible, if objected to, for the purpose of establishing the previous negligence of defendant in maintaining it where it was.

7. TRIAL—INSTRUCTIONS—REFUSAL OF REQUEST.
    It is not error for a court to refuse an instruction, requested by a party, directing the jury to disregard evidence which such party himself introduced without objection, and when no motion was made to strike it out.

8. SAME—CONSTRUCTION OF INSTRUCTIONS.
    The charge of a court must be construed with reference to the evidence before the jury, and to the presumption that the jurors are possessed of ordinary intelligence, and will so understand and apply it, where they are charged that they must be governed solely by the evidence in determining all questions submitted to them.

9. DAMAGES—PERSONAL INJURY.
    In an action for a personal injury, evidence is competent to show the character of plaintiff's ordinary pursuits, and the extent to which his injury has prevented or will prevent him from following those pursuits; and the jury should take into consideration whether his injury is to any extent so permanent as to diminish his capacity to earn money in the future, and fix the damages on that branch of the case with reference to his earning capacity before and after the injury.

In Error to the Circuit Court of the United States for the Northern District of California.

Frank McGowan and Frederick B. Lake, for plaintiff in error.

F. P. Primm, Reddy, Campbell & Metson, and I. D. Orton, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge. This action was brought to recover damages for injuries received by the defendant in error, alleged to have been occasioned by the negligence and carelessness of the plaintiff in error, on February 3, 1896, at the city of Redding, Cal. It appears from the pleadings and evidence that at said time the plaintiff in error maintained and used in said city a water tank or hydrant, from which it took water to use in the management of its railroad, and which was situated about three feet distant from the track upon which it run its train of cars in the conveying of passengers into and from the city; that this tank or hydrant was inclosed in a wooden box or frame about two feet wide, three feet long, and two feet deep; that the said box or frame was imbedded in the ground, the top thereof being even with the surface of the ground,

and was provided with a wooden lid or cover about two feet high and three feet long, which was used for the purpose of covering said tank. The answer admits the maintaining and use of the hydrant, but denies that "any tank or hydrant was maintained or used at any point where passengers arriving in said city alighted from the cars of said defendant." The defendant in error on the date mentioned was a passenger upon the train of the plaintiff in error from the town of Anderson to the city of Redding. The complaint alleges:

"That when said train arrived in said city he lawfully alighted therefrom after it had stopped for the purpose of permitting the passengers to alight from the cars of said train. That plaintiff, after alighting from a car of said train, accidentally stepped into said box or hole, which had negligently and carelessly been left uncovered by said defendant, its agents and servants, and was thereby without any fault or carelessness on his part, thrown back upon the track of said railroad and under said cars; and, said train starting forward while being managed and conducted by said defendant and its agents and servants, a wheel of one of the cars of said train ran over and crushed plaintiff's foot, and his said foot was so badly injured thereby that it became and was necessary to amputate the same, and he then and thereby sustained a severe and permanent shock to his nervous system, and was put to a great expense in the employment of a physician, and has been wholly deprived of earning wages by manual labor for his support. * * * That the injuries so received by him at the time and place aforesaid are permanent in character."

The court, in its charge to the jury upon material points, among other things, said:

"(1) To support the plaintiff's action in this case, it must appear that the defendant was guilty of negligence, and that this negligence was, the proximate cause of the injury to plaintiff. * * * It was the duty of the defendant railway company to keep its premises, the approaches to its depots and yards, and such places as it permitted the traveling public to use, in good order and in safe condition; and if you believe from the evidence that the water box and place was not safe (that is to say, if you believe from the evidence that the water box was left uncovered, or in such a position as to render it unsafe for persons getting on or off the cars of defendant at the time in the complaint alleged), and if you find that it was in such dangerous or unsafe condition, and that the plaintiff, alighting from the car, fell therein, and that he was, by reason of such dangerous and unsafe condition of said box, and the fall therein, injured and damaged, then your verdict should be for the plaintiff for the amount which you find the plaintiff to have suffered in damages. But, if you find as a fact that the immediate and proximate cause of the injury to plaintiff was the negligent or careless manner in which he alighted from the train of the defendant, then your verdict must be for the defendant."

To this no objection was made or exception taken.

"(2) In arriving at your verdict as to the amount of damages to which the plaintiff should be entitled, if you should find him entitled to any, you should take into consideration the personal injury to the plaintiff, the loss of his foot, the loss of his wages, the pain and suffering which he may have endured, and the amount of expense to which he was put by reason of such injury, and render such a verdict as you believe from the evidence to be just under all the circumstances."

The exception taken to this instruction is confined to the use of the words "the loss of his wages."

There are 43 specific assignments of error. Their discussion may appropriately be brought under two distinct heads, with but few subdivisions: (1) Alleged errors in admission of certain testimony; (2) alleged errors in giving and refusing to give certain instructions.

1. With reference to the exceptions taken to the admission of evidence:

Mr. Primm, one of the attorneys for the defendant in error, was the first witness called in his behalf, and testified that after his employment as an attorney, and for the purposes of this case, he made measurements, and caused to be made a map, showing the situation of the various points; that after the map was made he took it and went down to the railroad track, and compared it with the objects there, to see that it was correct, and familiarized himself with the surroundings in relation to the place where the train coming from the south and going to the north ordinarily and usually stops in the morning; that he went down to the train a number of times to get the length of the train, in order to see how far the steps of the car would be over the water box, and to see just how far the end of the train would be from the main passageway, or the lower passageway, where the passengers travel; that the map was a correct representation of the railroad and station at Redding, with respect to the building and track, and of the location of the water box and other places mentioned by him. He was then permitted to point out these places on the map, and show to the jury the situation of the tracks, the depot, the streets, and the hole as it was at the time of the accident. The map was afterwards introduced in evidence. Objections were made to all of this testimony. In fact, objections were made to nearly every question asked of the witness, and exceptions duly taken to every ruling of the court admitting the answers to be given. In this connection like objections were made to the testimony of several other witnesses as to the usual stopping place of the train. The objections to the map and to Mr. Primm's testimony will first be noticed. The specific points argued by counsel in support of their objections are that the witness was not familiar with the facts of the case, except what he heard from others, and that he had no right to locate upon the map, by hearsay evidence, an imaginary train of cars, in the position he claimed it was at the time of the accident, and then verify such location of the train by further hearsay evidence. The map was shown to be substantially correct by the testimony of several other witnesses who were familiar with the facts. There is no pretense that it did not correctly represent the places thereon delineated. A bare statement of the facts, in the light of the previous decisions of this court upon like questions, carries with it the conviction that the court did not err in any of its rulings relative to the admission of the map, and the testimony of Mr. Primm in regard thereto. Construction Co. v. Danner, 38 C. C. A. 528, 97 Fed. 882; Railroad Co. v. Roller (C. C. A.) 100 Fed. 738. With reference to the testimony as to the place where the train usually stopped, this of itself might be, in a measure, immaterial. The important question was, where did the train stop on the morning of the accident? All of the positive testimony on this point tends to show that it stopped at the usual place. There is no testimony to the contrary. If it stopped at the usual place, it was material and important, because it would have a tendency to show how near to the place where the passengers got off, the

hydrant or hole was located. There was positive testimony upon
both of these points. Some of the witnesses were runners for the
different hotels, who had for years been familiar with the place
where the train usually stopped, and they testified that the hydrant
or water box was so near the place where the passengers got off that
they were often in the habit of standing on the cover when the
ground was wet, and that it was within a few feet of that point.
One of these witnesses testified: That he had seen the trains "stop
right over the hole,—the steps of the smoking car and the day
coach,—and sometimes it would be three or four feet past it, north
of it * * * and south of it." That sometimes the train stopped
so that the passengers would have to step on the lid of that box when
they got off from the steps of the car, before they could get onto
the ground, and some trains would stop so that they would not
have to step on it. "Q. On this particular morning, was that hole
covered or uncovered? A. It was uncovered. Q. Did you see Mr.
Hall on that morning? A. I saw him after he was hurt. After I
stepped into this hole, and got out of it, the first man I saw was Mr.
Hall lying there in front of me, a few feet north of the box, and his
foot was crushed and bleeding, and he asked me to get him some-
thing to stop the pain." There was a conflict in the evidence as to
whether the train had come to a full stop, on the morning in ques-
tion, before Hall got off, and also as to whether he fell in the water
box. But there was none as to the fact that the cover of the box was
off, and that the hole was left exposed. Touching these points, the
defendant in error testified that when the station, "Redding," was
called out, he got up and walked to the door and looked out, and
it seemed so dark that he walked across the platform; that there
were two passengers ahead of him, who got off on the depot side;
that he got out on the other side; that he took hold of the railing
and went down the steps; that the train had stopped; that he stepped
onto the ground, and, about the first step or second that he made,
he stepped into something, and fell; that he did not know at that
time that the water box was there; that his foot fell onto the rail
and caught; that he tried to pull it out, and he could not; that the
car moved slowly; and that the wheel of the car went over his foot.

D. E. Masterson, a witness on behalf of the defendant in error,
testified that he was a passenger on the same train, and in the
smoking car with Hall; that when the brakeman called out, "Red-
ding," the passengers in the car got up; that Hall got up in front
of him, and walked to the front of the car and out and across
the platform of the smoking car, onto the platform of the baggage
car, and stepped down on the ground, stumbled, and fell forward;
that, as he went to see what was the matter, some one had pulled
him out from the track, and dragged him away five or six feet,
and said, "This man is hurt;" that he saw the hole afterwards,
and that it was uncovered; that the place where Mr. Hall got off
on that morning was the usual and ordinary place where people
got off when going to the east side of Redding; that the train
had stopped when Hall got off; that, when he (the witness) stepped
down from the steps, some one hollered to him: "Look out! There's

a hole;" that he looked down, and saw the hole there, walked around it, and went to Mr. Hall; that the hole alluded to was about opposite the coupling between the smoking car and the baggage car; that the car had moved forward a little, and when Hall stepped down the hole was right opposite the platform of the baggage car. Here the court asked a question:

"Q. You passed by? A. Yes, sir. Q. And left it to your right? A. Yes, sir; but I would unquestionably have stepped into it if my attention had not been called to it."

In the light of this testimony, it becomes apparent that the objections so frequently made to any testimony being given as to the "place where the train usually stopped" were without merit, and were properly overruled.

To the testimony of the defendant in error that he was a carpenter by trade, but most of the time he had been engaged in mining, objections were made because the complaint did not allege that he had any trade or calling. These objections were promptly and properly overruled. The allegation in the complaint is that he "has been wholly deprived of earning wages by manual labor for his support." This was sufficient to impart notice of his claim that he had previously earned wages by manual labor, and the plaintiff in error could not have been taken by surprise by the admission of the testimony upon this point. Moreover, in actions for personal injuries, the plaintiff, although there is no specific averment in his complaint as to his previous trade or calling, may introduce testimony as to what his business or occupation was, as such evidence is always material and pertinent upon the question of damages. Wade v. Leroy, 20 How. 34, 43, 15 L. Ed. 813; Nebraska City v. Campbell, 2 Black, 590, 17 L. Ed. 271; District of Columbia v. Woodbury, 136 U. S. 450, 459, 10 Sup. Ct. 990, 34 L. Ed. 472; Railroad Co. v. Clarke, 152 U. S. 230, 243, 14 Sup. Ct. 579, 38 L. Ed. 422; Railroad Co. v. Davidson, 22 C. C. A. 306, 76 Fed. 517, 522.

Before noticing other exceptions to the admission of testimony, in order that the conditions may be better understood, it will be proper to state other facts. At the time of the accident the defendant in error was 59 years of age. He was first taken to a hotel, and then conveyed to the residence of Mr. Nash, his cousin. Dr. J. H. Miller, a physician and surgeon, was then immediately called. He testified at the trial that he found Hall with his left leg and ankle so badly broken that amputation was necessary; that there was great laceration of the tissues and bones above and below, and at the ankle joint; that he amputated his leg about $3\frac{1}{2}$ inches above the ankle joint; that he thereafter attended him professionally for about six weeks; and that Hall was confined to the house for two months. In reply to a question whether such a fracture would cause pain, he answered:

"Of necessity, it must. At the time, at the moment, perhaps, there would be but little pain, on account of the shock that follows. After recovery from the shock, but before and after amputation, the result of the injury is followed by considerable pain. Q. And how long does that continue, doctor, usually? A. Well, there is pain until recovery, and there is pain after recovery. Q. Will

you please state, as a medical man, whether or not, with a leg amputated as that was, there is more or less pain at times after it is healed over? A. Yes, sir; up to the time of the death of the patient."

The doctor also testified that, from the effects of the fracture and the amputation, Hall's health would be greatly impaired. And in this connection the defendant in error testified, in reply to a question whether he suffered any pain:

"I did; immense pain. I suffered an awful pain, and I ran down so I don't think I weighed one hundred and thirty, from one hundred and eighty-five. I have pain at the present time all the way through from my knee down, and there is just as much pain in my foot that is gone as there is in my leg."

After the doctor had testified as above stated, to which there was no objection, the following questions were asked, and answers given:

"Q. You know, doctor, do you, about what is required of an average miner or carpenter,—what they have to do? A. Yes, sir. Q. I will ask you to state to the jury whether or not, in your opinion, after that amputation and after the loss of the foot, Mr. Hall would be able to perform the work of a carpenter, such as climbing over ladders and standing on scaffolds, or the work of a miner, in going around the timbers of a mine? A. There are cases where men with an amputated limb are capable of doing a great deal of work. But, when a man has reached the age that Mr. Hall has reached, it makes a very great difference. They are not as able to do work, or nearly as able to do work, after amputation of that kind, as before. * * * Q. You have been in mines, I presume, have you not, doctor, and you know what is required of the average miner? A. Yes, sir. Q. Can a man perform the work of a miner, with an artificial limb, such as Mr. Hall has, with as much safety and readiness as if he had his natural limbs? A. He cannot do as good work as he could, had he not suffered amputation."

There were no objections that the questions were leading. The objections were that a physician is not a competent witness to speak upon such subjects, and that there is nothing in the complaint to show that Hall was a carpenter or miner. It is argued that these objections were well taken, because the subject-matter of the inquiry was of such a character as would come within the understanding of all men of common knowledge and education, moving in the ordinary walks of life, and that opinions of experts in such cases are inadmissible. The general rule is well settled that when the question to be determined is the result of common experience, or is to be inferred from particular facts, the inference is to be drawn by the jury, and not by the witness. Railway Co. v. Kellogg, 94 U. S. 469, 473, 24 L. Ed. 256; Motey v. Granite Co., 20 C. C. A. 366, 74 Fed. 155, 159; Sappenfield v. Railroad Co., 91 Cal. 48, 60, 27 Pac. 590; Pacheco v. Manufacturing Co., 113 Cal. 541, 545, 45 Pac. 833; City of Chicago v. McGiven, 78 Ill. 347, 349; Pennsylvania Co. v. Conlan, 101 Ill. 93, 103; 12 Am. & Eng. Enc. Law (2d Ed.) 458, and authorities there cited. The witness stated that he knew the kind of work that was required of a carpenter and of a miner. It was, in part, his knowledge as an ordinary man that enabled him to answer the question. If the testimony of any witness upon the points was admissible, the fact that he was a physician did not affect his testimony, or render it incompetent. If no testimony whatever was admissible, because it was within the common knowledge of the jurors, it was error without injury.

It is apparent, from the unquestioned facts, that the jurors, as intelligent men, would naturally and reasonably infer that Hall could not perform his work, as a carpenter or miner, with as much safety and readiness as if he had the use of his natural limbs. But we are unwilling to say, in the light of all the facts, that it was error to allow the physician to give his opinion as to what the effect of the fracture and amputation would be in regard to Hall's capacity to perform manual labor. If no artificial limb had been procured, the question would be transparent; but the conditions resulting from the use of such a limb may be said, to a certain extent, at least, to be more clearly within the knowledge of, and may be presumed to be better understood by, a physician, than it is by the common knowledge of men engaged in the ordinary affairs of life.

The following question was propounded to, and answer given by, the defendant in error: "Q. How much did you have to pay for your artificial limb? A. It cost one hundred dollars,"—to which objection was made upon the ground that there is no allegation in the complaint of any special damage incurred for the procurement of an artificial limb. From a legal standpoint, this objection should have been sustained. The purchase of this limb was an expense incurred by reason of the result of the injury, for which, if properly alleged in his complaint, he would be entitled to recover, but it does not fall within the category of any expense which can be allowed under an averment as to general damages. The rule upon this subject is thus stated in 2 Greenl. Ev. (15th Ed.) § 254:

"All damages must be the result of the injury complained of. * * * Those which necessarily result are termed 'general damages,' being shown under the ad damnum, or general allegation of damages, at the end of the declaration; for the defendant must be presumed to be aware of the necessary consequences of his conduct, and therefore cannot be taken by surprise in the proof of them. * * * Some damages are always presumed to follow from the violation of any right or duty implied by law. * * * But where the damages, though the natural consequences of the act complained of, are not the necessary result of it, they are termed 'special damages,' which the law does not imply; and therefore, in order to prevent a surprise upon the defendant, they must be particularly specified in the declaration, or the plaintiff will not be permitted to give evidence of them at the trial."

In Railway Co. v. Cotton, 41 Ill. App. 311, 316, the court said:

"It is alleged that evidence of the cost to plaintiff of procuring a new wooden leg was erroneously admitted, against objection, and when no averment or claim for special damage in the declaration justified its admission. To this contention we are compelled to accede."

This error, however, does not require a reversal of the case. The defendant in error, although claiming that the question was proper, offers, if the court should arrive at the conclusion that it was error, to remit from the amount of the judgment the sum of $100. The judgment should therefore be modified to that extent.

2. With reference to the instructions:

It is claimed that the court erred in refusing to give the following instruction asked by the plaintiff in error:

"There has been some evidence introduced here tending to show that some time after the happening of the injury to the plaintiff the defendant altered or repaired the premises, and removed or altered the water box mentioned in

the complaint. If you find as a fact that the water box mentioned in the complaint was altered or removed after the 3d of February, 1896, I charge you that you are not at liberty to take such fact, if you so find it, into consideration, in determining the question of defendant's negligence or lack of negligence on the 3d of February, 1896."

If the defendant in error had introduced such testimony, and it had been objected to by the plaintiff in error, and allowed by the court, it would have been erroneous, because such removal or repair would not affect the question of previous negligence, and it ought not to be said that by the subsequent removal of the box, or adoption of some other plan to secure it, in order to prevent like accidents in the future, it was an admission upon its part that it had been negligent in the past, by keeping it at the place where the accident occurred. Railroad Co. v. Hawthorne, 144 U. S. 202, 207, 12 Sup. Ct. 591, 36 L. Ed. 405; Motey v. Granite Co., 20 C. C. A. 366, 74 Fed. 155, 159; Downey v. Sawyer, 157 Mass. 418, 420, 32 N. E. 654; Railroad Co. v. Lee (Ind. App.) 46 N. E. 543, 545; Railroad Co. v. Clem, 123 Ind. 15, 17, 23 N. E. 965, 7 L. R. A. 588; Electric Co. v. Lubbers, 11 Colo. 505, 508, 19 Pac. 479; Green v. Water Co. (Wis.) 77 N. W. 722, 726; Giffen v. City of Lewiston (Idaho) 55 Pac. 545, 550. But an examination of the record discloses the fact that the only testimony offered upon this point was brought out by the plaintiff in error in examining its own witnesses. Counsel have failed to cite any authorities or advance any reason why it should be allowed to take advantage of its own error in this regard. We presume that their failure in this respect is attributable to the fact that no reason or authority in support of such a proposition can be given, because none exists. No rule of law is better settled than that the parties must abide by the consequences of their own acts, and cannot seek a reversal of the case upon appeal for error which they had committed or invited. 2 Enc. Pl. & Prac. 519, and authorities there cited. The testimony having been admitted without objection, and no motion having been made to strike it out, the court did not err in refusing to instruct the jury not to consider it. Janson v. Brooks, 29 Cal. 214, 223; Morrell v. Morgan, 65 Cal. 575, 4 Pac. 580; Dalton v. Dalton, 14 Nev. 419, 426; Watt v. Railroad Co., 23 Nev. 154, 163, 44 Pac. 423, and 46 Pac. 52, 726; Warder, Bushnell & Glessner Co. v. Ingli, 1 S. D. 155, 157, 46 N. W. 181.

The other instructions asked for by the plaintiff in error, and refused by the court, will not be reviewed. Most of them relate to the question of negligence and degree of care required upon the part of the railroad company. No objections were made nor exceptions taken to the charge of the court upon these questions. Moreover, the charge of the court was correct, and fully covers the issues presented by the pleadings and testimony in the case. This being true, it follows that the court did not err in refusing to give any of the instructions asked for by the plaintiff in error upon any of the points covered by the charge in the court's own language. Railroad Co. v. Roller, supra.

The only objection made to the charge of the court upon the measure of damages is, as before stated, to the words "the loss of his

wages"; and to this it is urged that the jury could not tell what wages were meant,—whether the wages Hall lost while he was sick, or the prospective wages which he might have earned during the rest of his life; that the jury might have understood it to mean that Hall was entirely incapacitated from earning a livelihood, and had the right to assume that he was entitled to a sum of money, as damages, equal to what his wages in the future would amount to.   In the discussion of such questions the courts proceed upon the theory that the jurors are possessed of ordinary intelligence.   The language used by the court would naturally be understood as having reference solely to the testimony that had been admitted.   The fact is that Hall was not entirely incapacitated from earning wages.   His earning capacity was decreased to the extent of his inability to perform labor and earn wages as he might reasonably have been able to do if he had not been injured, and to this extent the jury should take into consideration "the loss of his wages."   The language of the court, taking the entire charge upon this subject, is not susceptible of any other construction.   The jury were not at liberty to assume any state of affairs that was not consistent with the testimony.   The court in its charge directly instructed the jury that:

"In passing upon or determining any question of fact that may be involved in this case, you will be governed solely by the evidence introduced. The law will not permit jurors, in the trial of causes, to speculate or engage in mere conjectures, or indulge in inferences not warranted by the evidence, or to be governed by mere sentiment, sympathy, passion, or prejudice, or to be influenced to any extent or in any manner by the financial worth or poverty of either of the parties. But whatever conclusions are reached must be based entirely upon the evidence introduced in this case."

It will be noticed that to the portion of the charge stating what things should be taken into consideration, including the loss of his wages, the court added, "and render such a verdict as you believe from the evidence to be just under all the circumstances."   The charge of the court in its entirety is correct, and is fully supported by reason and authority.   In actions of this nature, testimony tending to show the character of the plaintiff's ordinary pursuits, and the extent to which the injury he received by the negligence of the defendant has prevented or will prevent him from following those pursuits, is competent; and the jury should take into consideration whether his injury was to any extent so permanent as to diminish his capacity to earn money in the future, and upon this point to fix the damages with reference to the plaintiff's earning capacity before and after the injury.   8 Am. & Eng. Enc. Law (2d Ed.) 651–653, and authorities there cited.

In Railroad Co. v. Putnam, 118 U. S. 545, 554, 7 Sup. Ct. 1, 30 L. Ed. 257, the court said:

"In an action for a personal injury, the plaintiff is entitled to recover compensation, so far as it is susceptible of an estimate in money, for the loss and damage caused to him by the defendant's negligence, including not only expenses incurred for medical attendance, and a reasonable sum for his pain and suffering, but also a fair recompense for the loss of what he would otherwise have earned in his trade or profession, and has been deprived of the capacity of earning by the wrongful act of the defendant."

The judgment of the circuit court will be modified so as to read for the "sum of eight thousand four hundred dollars," instead of for "eight thousand five hundred dollars," and as so modified it is hereby affirmed.