## THE PEOPLE *v.* FERRARIS.

### APPEAL from the District Court of Aguadilla.

No. 193.—Decided December 24, 1909.

CRIMINAL LAW—ADULTERATED MILK—PROOF OF KNOWLEDGE.—Where the legislature makes the mere sale or possession of adulterated milk an offense, it is unnecessary to prove knowledge of such adulteration on the part of defendant.

ID.—KNOWLEDGE ESSENTIAL ELEMENT OF CRIME.—Where a statute makes knowledge of unwholesome or adulterated milk an essential element of the crime, it is necessary to prove such knowledge.

ID.—FRAUDULENT INTENT—ELEMENT OF CRIME.—Where the legislature uses the words *fraudulent* or *with fraudulent intent* to qualify the act of adulteration, it is apparently the intention to make guilty knowledge an element of the crime.

ID.—FRAUD.—Where fraud is alleged clear proof thereof is necessary to establish its existence.

ID.—PROOF OF ADULTERATION.—After an examination of the evidence in this case the court held that there was no proof of adulteration, following *The People of Porto Rico* v. *Pinto,* 15 P. R. Rep. p. —.

ID.—SETTLED PRINCIPLES OF LAW.—Settled principles of law cannot be disregarded in order to remedy the hardships of special cases.

The facts are stated in the opinion.

*Mr. Rossy, fiscal,* for respondent.

MR. JUSTICE WOLF delivered the opinion of the court.

Rosendo Ferraris was charged in the District Court of Aguadilla with the crime of having maliciously and with fraudulent intent offered for sale adulterated milk as pure. He was found guilty and sentenced to six months in jail and to the payment of $100 fine.

The appellant alleges several grounds of error which may be reduced to two, namely, that at the trial in the court below there was, first, no proof of adulteration and, second, that there was no proof of a fraudulent intent or malice. We shall first consider the alleged failure to show a fraudulent intent.

At the threshold of this investigation we are met with the suggestion that proof of a fraudulent intention is rendered unnecessary by virtue of the Act of March 11, 1909, Laws of 1909, page 140. It is as follows:

"Section 1.—That section 337 of the Penal Code, be amended so as to read as follows:

"Section 337.—Every person who adulterates or dilutes any article of food, drink, drug, medicine, spirituous or malt liquor, or wine, or any article useful in compounding them, with a fraudulent intent to offer the same or cause or permit it to be offered for sale as unadulterated or undiluted, and every person who fraudulently sells, or keeps or offers for sale the same, as unadulterated or undiluted, is guilty of a misdemeanor and shall be punished by a fine not exceeding one hundred dollars or imprisoned in jail not exceeding three months and in addition to such punishment the adulterated article shall be confiscated. In all cases in which the adulterated article is milk, the person guilty of such adulteration, keeping or offering for sale such article, shall be sentenced to imprisonment for a term of from two to six months and fined from thirty to one hundred dollars, *Provided,* that the person found guilty a second time of adulteration, keeping or selling adulterated milk shall be punished by imprisonment for a term of from six months to one year, and fined from one hundred to three hundred dollars, and his license shall be revoked. The sentence imposed on such person shall be published in two of the papers having the largest circulation in the island, and shall also be made known by means of bills which shall be posted in public places and at the

domicile or establishment of the guilty person, all of which shall be paid for by such person.

Section 2.—Jurisdiction for the punishment of violations of the provisions of this act relating to adulterations of milk, is hereby taken from the municipal courts and conferred exclusively upon the district courts.

Section 3.—Any law or part of law in conflicting herewith is hereby repealed.

Section 4.—This law shall take effect from and after April 1, 1909.''

There are two different classes of crimes defined in the first part of section one, namely, the act of adulterating articles of food, drinks, etc., with fraudulent intent to sell or suffer a sale, and second to fraudulently selling, keeping or offering for sale the same as unadulterated or undiluted. Then follows a penalty. Then the statute provides that where, in the commission of either of such offenses, such ''adulterated'' article is milk a different and a severer penalty may be inflicted, which is liable to be much augmented in the event of a second offense.

With this analysis of the statute before us it is impossible for us to reach the conclusion that the legislature meant to do away with the necessity of proving a fraudulent intent. A number of the legislatures of the various States knowing the difficulty of proving a fraudulent intent in cases of adulteration have done away with such necessity by casting the burden upon the seller of proving that the milk is not adulterated. Generally where this is done it is unnecessary to prove a fraudulent intent, and in some cases it is no defense to prove a want of guilty knowledge. (*People* v. *Snowberger,* 67 Am, St. Rep., 499; *Peg* v. *Tolson,* 8 Eng. Ruling Cases, 28, 29; *People* v. *O'Brien,* 31 Pac., 15; *Commonwealth* v. *Waite,* 93 Mass., 264; *Commonwealth* v. *Boynton,* 84 Mass., 160; *People* v. *Cipperly,* 101 N. Y., 634, and other cases.) In all these cases the statute itself rendered it unnecessary to prove a fraudulent intent. Where, however, the statute makes knowl-

edge of the unwholesomeness or adulteration an essential ingredient of the crimes it is necessary that such knowledge appear. (*Commonwealth* v. *Owen Hannelly,* 81 Mass., 195; *J. P. Anderson* v. *The State,* 30 Tex. App., 699; *Jesse Teague* v. *The State,* 25 Tex. App., 577; *People* v. *Brown et al.,* 16 Pac., 1; *Farrell* v. *The State,* 30 Am. Rep., 614 [see note]; *People* v. *Flack,* 11 L. R. A., 807 [note]; *Verona Central Cheese Co.* v. *Murtaugh,* 50 N. Y., 316.)

Mr. Justice Stephen sums up the principle in this wise:

"The principle involved appears to me, when fully considered, to amount to no more than this. The full definition of every crime contains expressly or by implication a proposition as to a state of mind. Therefore, if the mental element of any conduct alleged to be a crime is proved to have been absent in any given case, the crime so defined is not committed; or again, if a crime is fully defined nothing amounts to crime which does not satisfy that definition. Crimes are in the present day much more accurately defined by statute or otherwise than they formerly were. The mental element of most crimes is marked by one of the words 'maliciously,' 'fraudulently,' 'negligently,' 'knowingly,' but it is the general—I might, I think, say the invariable practice of the Legislature to leave unexpressed some of the mental elements of crime." (8 Eng. Ruling Cases, pp. 28, 29.)

Our statute uses the word "fraudulently" or "with fraudulent intent" to express this idea.

The proof at the trial showed that the defendant, who is a seller of milk, was in possession of milk alleged to be adulterated, and that he exposed it for sale, and that an expert examined such milk and found it considerably below the standard, the expert going so far as to state from his inspection that such milk "was very adulterated." There was, however, not the slightest proof that the defendant had any knowledge of the alleged adulterated character of the milk. Even in civil cases, where fraud is alleged, some "clear" proof is necessary. (*People* v. *Lalone,* 164 U. S., 260.) In a criminal prosecution no matter what its nature, where the statute makes a certain element necessary to be proved, it is essential to prove

such matter beyond a reasonable doubt. (*People* v. *Milgate,* 5 Cal., 127; *People* v. *Landman,* 103 Cal., 580; *People* v. *John Brannon,* 47 Cal., 96.) Perhaps a number of adulterators may escape punishment. That is a matter for the legislature. "The settled principles of law cannot, with safety to the public, be disregarded in order to remedy the hardship of special cases." (*Buchanan* v. *Silchfield,* 102 U. S., 293; *Lake County* v. *Bollins,* 130 U. S., 673.)

There was no proof that the milk was adulterated. The principle that governs this matter has been discussed in the case of *People of Porto Rico* v. *Pinto,* decided on this 22d day of December, 1909.

For these reasons the judgment must be reversed and the case sent back for a new trial.

*Reversed.*

Chief Justice Hernández and Justices Figueras and del Toro concurred.

Mr. Justice MacLeary dissented.

### DISSENTING OPINION OF MR. JUSTICE MACLEARY.

Not being able to agree with my colleagues in their decision of this case, I respectfully present my reasons for dissenting.

This is a prosecution for the offense of exposing for sale adulterated milk. The language of the accusation, which was presented by the *fiscal* in the District Court of Aguadilla on June 10 of the present year, was literally as follows:

"The *fiscal* files an information against Rosendo Ferraris, for an offense against public health, committed as follows: Said Rosendo Ferraris at Aguadilla, within this judicial district, one day of the month of May, 1909, maliciously and with fraudulent intention, kept and offered for sale, as pure, adulterated milk."

The defendant, on being arraigned, pleaded not guilty. On the 16th a trial was held and the accused was found guilty

as charged, and condemned to six months imprisonment and to a fine of $100 and the payment of all costs of the prosecution. The defendant at once took an appeal from the judgment of conviction to this court. A statement of the case was prepared, approved and filed on July 12, 1909, and the record presented to the secretary of this court two days later. The case came on to be heard in this court on the third day of last month and oral arguments were made on behalf both of the appellant and the respondent, and they were each granted five days more time within which to file written briefs.

On behalf of the appellant counsel filed a brief setting out as reasons for a reversal of the judgment of the court below the propositions following, to wit:

"(a) That there does not exist proof of *adulteration* in its legal acceptation of addition of a foreign substance to food, as the report of the expert chemist alone, without further explanation, without stating the reason of his statement, together with the analysis, cannot have any other effect than the plain proposition that the analyzed liquid does not comply with the official standard.

"(b) That even admitting as proven an adulteration, it is necessary to show that the same was caused by the agency of the accused, or that with his knowledge of such adulteration he sold, as pure, the adulterated milk, thus deceiving and defrauding the public in the substance of the article sold. In short, that in this, as in all crimes, it is not sufficient to show the guilty action but the relation or connection of the accused with the same, it being impossible to derive a presumption of the guilt of the accused from the mere act of having the milk in question for sale in his store, for the following reasons:

"1. Because such presumption is not authorized by law.

"2. Because it is contrary to the presumption of innocence of the accused.

"3. Because such presumption is contrary to sound reasoning, as it is not sufficient to show the guilty action, but the relation or con-owner of the cattle or the person who procured the milk, or by the persons who brought it to market, or by the employes of the accused. In the same manner as the mere possession of stolen articles does not authorize a conviction, the sole existence of adulterated food or drinks, if the adulteration is not easily detected without a chemical examination, cannot be used as basis for a sentence of condemnation."

Let us consider these matters in the order in which they are presented by appellant's counsel. The statute provides for the punishment of persons having in their possession and offering for sale as pure adulterated or diluted milk. However, no charge is made in this case that the milk was *diluted;* but it is alleged to have been *adulterated.* The noun *adulteration* is defined by Webster as "the act of adulterating; corruption or debasement (especially of food or drink), by foreign mixture." (Webster's Int. Dict., p. 24.)

The same word is defined by Bouvier as follows:

"*Adulteration.*—The act of corrupting or debasing; the act of mixing something impure or spurious with something pure or genuine, or an inferior article with a superior one of the same kind. (See 16 M. & W., 644; 2 Ired. L., 40.)

"As to the police powers of a state in making regulations for the protection of health and the prevention of fraud (see 127 U. S., 678). In England and in most of the United States, there are laws punishing the adulteration of, or sale of adulterated, food products, beverages, and drugs, either in general, or specifically. (See Laws N. H., 1891, c. 39; [1892], 1 Q. B. 220; E. g. cheese, Laws Wis., 1891, c. 264; honey, Laws Minn., 1893, c. 21; Laws Vt., 1890, c. 58; lard, Act Pa., 1891, June 8, P. L., 213; 81 Iowa, 642; milk, 153 Mass., 159; 155 Mass., 442; 157 Mass., 460; 159 Mass., 8; 160 Mass., 533; 12 N. Y. S., 628; 65 Hun., 582; 123 N. Y., 70; 68 Hun., 341; 85 Hun, 71; 1 D. R. [Pa.], 51; olive oil, Stat. Cal., 1891, c. 47; and vinegar, Laws Kans., 1891, c. 1; Laws Mo., 1891, p. 218; Act. Pa., 1891, June 11, P. L., 297; Laws Wis., 1891, c. 394; 40 N. E. Rep. [Ohio], 1001.)

"Adulterations of food, when wilful, are punishable by the laws of most countries. In Paris, malpractices connected with such adulteration are investigated by *conseil de Salubrité,* and punished. In Great Britain, numeros acts have been passed for the prevention of adulterations; they are usually punished by a fine determined by a summary process before a magistrate. In Pennsylvania, the adulteration of articles of food and drink, and of drugs and medicines is, by a statute of March 31, 1860, made a misdemeanor punishable by fine or imprisonment, or both." (1 Bouvier's Law Dict., p. 105.)

The appellant, in the first place, contends that there was no proof found in the record that the milk was adulterated;

but that it only appears that it did not reach the standard fixed by the board of health.

Now let us see whether or not the milk found in possession of the defendant was proven to be adulterated. The evidence is to the following effect: The inspector found the milk in the possession of defendant- and exposed for sale. He purchased three flasks of it and marked them No. 65.

The chemist received the flask so marked and, for his own purposes, numbered it 6664. He analyzed its contents and found them to contain: Water, 89.561 per cent; dry residuum, 10.439 per cent; solids without grease, 8.239; grease, 0.22. From this chemical examination he arrived at the conclusion that the milk was greatly adulterated; and testified to that fact. Evidently the dry residuum was composed of the two last items of solids with and without grease. The professional opinion of the expert chemist and the fact of adulteration based thereon were received as evidence on the trial without any objection on the part of the defendant and prove conclusively that the milk offered for sale by the accused as pure was adulterated. This milk certainly falls below the standard established for pure milk, not only in this Island, but in the States of Rhode Island, New York and Massachusetts and perhaps many others. (See the opinion of the court in the case of the *State* v. *Smythe,* 14 R. I., 100; also reported and annotated in 51 Am. Rep., pp. 344-354.) But these rules and standards are not involved nor drawn in question here. Manuel Guillermety, the chemist, after stating the result of his analysis says, as the fact arising therefrom, that the milk was very much adulterated. There is no evidence whatever to the contrary in the record. Not having taken an exception to the testimony of the expert in the trial court the defendant cannot be heard here on appeal to question the effect of the evidence produced.

It is possible that the trial court, had objection been made by the defendant to receiving the opinion of the expert chemist

as evidence, might have excluded it; but, no objection being made and the evidence being admitted by common consent, it was sufficient, when uncontradicted, to prove that the milk, which was offered for sale as pure, was adulterated. Of course, if the defendant had brought forward other evidence to contradict the testimony of the chemist and to prove that the milk in question was pure, such evidence would have been received and considered. But it is too late, in this appellate court, to question the sufficiency of evidence received on the trial in the court below without any objection or comment whatever. This court, less than a year ago, sustained this principle in an opinion written by Mr. Justice Wolf, using the following language:

"But appellants now object, principally with respect to evidence of Serrano, that the best evidence of the tutorship would have been the judicial statement to that effect. It is a principle of law that any probatory testimony may be considered by the court if no objection is made to its admission. What is not objected to is generally waived. (*Burton* v. *Driggs*, [20 Wall.] 87 U. S., 133; *District of Columbia* v. *Woodbury*,, 136 U. S., 450, 462; *Patrick* v. *Graham*, 132 U. S., 627; *Coinden* v. *Doremus*, [3 How] 44 U. S., 515.) This is an application of the maxim "*Consensus tollit errorem.*" Broom's Legal Maxims, 135.) (*Falero* v. *Falero*, decided on Feb. 19, 1909.)

We should therefore conclude it to have been sufficiently established that the defendant had adulterated milk in his possession, at his place of business, and exposed the same as pure for sale, as charged in the information.

The second point made by the appellant's counsel is that the proof must show that the defendant was the guilty agent who caused the adulteration of the milk; or that with his knowledge of its adulteration it was exposed for sale as pure, deceiving and defrauding the public—that is to say, that in this, as in all other offenses, it is not sufficient merely to show the punishable act without connecting the accused with the same—and that a presumption of the guilt of the defendant cannot be derived from the mere fact of his having the adul-

terated milk in his shop for sale.    Counsel gives three reasons to maintain this proposition, to wit, that the law authorizes no such presumption, that it is contray to the presumption of innocence and that such a presumption is illogical.

In commenting on the English law, from which our American criminal law is derived, a recent author of the highest authority says:

"The rules of evidence are somewhat different in cases of this kind from what they are in most criminal cases.    The mere possession of adulterated milk by a milk dealer is *prima facie* proof that he is exposing it for sale fraudulently with intent to deceive and defraud his customers.    Of course, he can show that his possession is altogether innocent, but it is incumbent on him to do so; the prosecution being held to have made out a case when the possession of the adulterated article is shown.    This rule obtains because the fraudulent intent is very difficult for the prosecution to show, and the circumstances being all within the knowledge of the dealer, if he is really innocent he can easily show it.    This does not contradict the presumption of innocence which only attends the accused until proof is shown making out a *prima facie* case of guilt." (Stephen Ev., 97; 2 Law Cr. Cases, 227; *Commonwealth* v. *Hawkins* [3 Gray 465], 69 Mass., 465.)

This is the English rule in such cases as is clearly shown by Lord Halsbury, who says:

"There are certain offenses in the prosecution of which proof of a particular intent or state of mind is not incumbent on the prosecution.    In some of these cases the defendant may excuse himself by proving that his intent or state of mind was innocent.    But in others, no such excuse is available.

"The prosecution may prove, but is not bound to prove, the motive for a crime, and, even in cases where innocence of intention is a defense, innocence of motive is no defense.    An act which is unlawful cannot in law be executed on the ground that it was committed from a good motive.

"Under this head fall many indictable nuisances, the procedure in which is only in form criminal (see *R.* v. *Stephens* [1866], L. R.

Q. B., 702). A prosecution for trespass in pursuit of game is also criminal in form, but has for its object the security of a civil right; in such a prosecution *bona fide* belief by the defendant that he was not a trespasser is no defense. (*Morden* v. *Porter* [1860], 7 C. B. [n. s.], 641; *Watkins* v. *Major* [1875], L. R., 10 C. P., 662.) There are a number of cases analogous to public nuisances, where an act is peremptorily forbidden and innocence of intention or mistaken belief is no defense. (R. V. Bishop [1880], 5 Q. B. D., 259, C. C. R.) In prosecutions under the Sale of Food and Drugs Act, 1875 (38 and 39 Vict. c. 63), a person who sells an adulterated or 'altered' article of food may be convicted, although he does not know of the adulteration or alteration. (*Betts* v. *Amstead* [1888] 20 Q. B. D., 771; *Pain* v. *Boughtwood* [1890], 24 Q. B. D., 353; *Dyke* v. *Gower* [1892], 1 Q. B., 220; *Morris* v. *Corbett* [1892], 56 J. P. 649; *Brown* v. *Foot* [1892], 61 L. J. [m. c.], 110; *Parker* v. *Alder* [1899], 1 Q. B., 20.) In a prosecution under section two of the Intoxicating Liquors (Sale to Children) Act, 1901 (1 Edw. 7, c. 27), which makes it an offense for a licensed person to sell intoxicating liquor to a child under 14 except in a vessel properly corked or sealed, *bona fide* belief on the part of the licensed person that the vessel in which the liquor was sold was properly corked and sealed is no defense (*Brooks* v. *Macon* [1902], 2 K. B., 743). So mere possession of a prohibited article may be criminal without knowledge (see *R.* v. *Marsh* [1824], 2 B. & C., 717 [possession of game by carrier]; *R.* v. *Woodrow* [1846], 15 M. & W., 404 [possession of adulterated tobacco by dealer]). Most of these cases where ignorance or innocence of intention is no defense are cases punishable by fines, and many of them are only punishable on summary conviction before magistrates.

''Intention is an operation of the will directing an overt act; motive is the feeling which prompts the operation of the will, the ulterior object of the person willing; e. g., if a person kills another, the intention directs the act which causes death, the motive is the object which the person had in view, e. g., the satisfaction of some desire, such as revenge, etc. (See Stephen History of the Criminal Law, vol. II, 110.)

''Thus, to a charge of publishing an obscene libel, if the publication is in fact obscene, it is no defense that the defendant had a good motive, e. g., to expose the evils of the confessional. (*R.* v. *Hicklin* [1868], L. R. 3 G. B., 360; *Steele* v. *Brannan* [1872], L. R., 7, C. P., 261.) In a prosecution for an indecent assault or abduction it is no defense that the defendant's motives were pure, e. g., to draw the attention of the public to the prevalence of alleged evils. (*R.* v. *Jar-*

*rett,* Times, 9th November, 1885, p. 3, 11th November, 1885, p. 3; C. C. C. Sess. Papers, October, 1885, and see p. 622, post.) If a person removes a corpse from a grave without lawful authority, it is no defense to such a person that he acted from pious and laudable motives. (*R.* v. *Sharpe* [1857], Dears and B. 160.) And if a duty is imposed by law and the breach of the duty is made punishable, a defendant who is charged with the breach cannot set up as a defense that he has a 'conscientious objection' to perform the duty which was imposed. (*R.* v. *Downes* [1875], 1 Q. B. D., 25 C. C. R.; *R.* v. *Senios,* [1899], 1 Q. B. 283, C. C. R.); but see the Vaccination act, 1898 (61 and 62 Vict. c. 49), and title 'Public Health.' (9th Halsbury's Laws of England, sec. 560, pp. 237-238, and notes thereto.)''

A distinguished American text-writer agrees with Lord Halsbury in the matter of *mens rea* and that in some offenses it is unnecessary to allege or to prove that the statute was violated with a criminal intent—that is to say, maliciously or fraudulently. Only three extracts will be made form this textbook.

''Ordinarily the principle that a criminal intent is a necessary element of crime applies to statutory offenses as well as to offenses at common law, for, as was explained in another chapter, penal statutes are to be construed in accordance with common-law principles, unless the legislature has clearly excluded such construction. The principle, however, is not inflexible in the case of statutory offenses. It is within the power of the legislature, if it sees fit, to dispense with the necessity of a criminal intent, and to punish particular acts without regard to the mental attitude of the doer. Because of the difficulty of proving a criminal intent in some cases, or for other reasons, public policy may require the legislature, in prohibiting and punishing certain acts, to provide that any person who shall do the act shall do it at his peril, and shall not be allowed to show in defense that he did not know of the existence of the circumstances rendering the act unlawful. If such an intention on the part of the legislature clearly appears, the court must give it effect, however harshly the statute may operate in the particular case.'' (Clark, Law of Crimes, pp. 78, 79.)

''Among the various statutes which some of the courts, but not all, have construed as not requiring a criminal intent, are statutes punishing bigamy, statutes for the protection of game and fish, stat-

utes punishing public officers for the expenditure of public moneys in excess of appropriations, etc., statutes punishing the sale of chattel mortgaged property, statutes punishing the sale of adulterated products, statutes punishing the sale of intoxicating liquors to slaves, or to minors, drunkards, etc. Generally, the cases in which this question arises are cases in which ignorance or mistake of fact is set up as a defense and these are treated more fully in another place."[1] (Clark Law of Crimes, pp. 81, 82.)

"In penal statutes the terms 'malice' and ' malicious' are often used in this broad sense, rather than as denoting any will or any specific intent to injure. Thus, under a statute punishing any person who should 'willfully and maliciously' place any obstruction on a railroad track, a person who placed an obstruction on the track for the purpose of obtaining a reward from the railroad company by giving notice of the obstruction was held guilty, though he intended to and did signal and stop a train so as to prevent injury. It was held that it was not necessary that he should intend to injure any one." (Clark on Crimes, p. 89.)

The court of Massachusetts and New York follow the English law, in announcing this doctrine, and it is said in a summary of their decisions that:

"The adulteration of vinegar, olive old, honey, maple sugar, cigarettes, confectionery, and other articles, is prohibited by statutes in several of the states of the Union.

"The fact that the law provides a somewhat unusual mode of proof of adulteration by means of the record of analyses of tests made, does not exclude other appropriate modes of proof which existed before. (*Com.* v. *Spear,* 143 Mass., 172.)

"In cases where the milk analyzed has not been taken under the provisions of the statute, the competency of evidence is to be determined by the common law, and the testimony of any person who has sufficient skill to analyse milk, and who has analyzed some of the milk shown to have been sold by the defendant, is admissible. (*Com.* v. *Holt,* 146 Mass., 38.)

"An act which virtually confines the testimony to an analysis of the samples which are destroyed in the process of analysis is constitutional. (*States* v. *Groves,* 15 R. I., 208.)

"Under the statutes prohibiting the sale of adulterated milk or butter or other adulterated articles, it has been held that criminal

intent is not an essential element of the offense. But it is necessary generally to prove an intent to sell; and under some statutes an intent to sell as food.

"Statutes providing that 'whoever sells or keeps, or offers for sale, adulterated milk, or milk to which water or other foreign substance has been added,' shall be punished, etc., have been held to throw the risk upon the seller of knowing that the article he offers for sale is not adulterated, and it is not necessary in an indictment under such a statute to allege or prove criminal intent or guilty knowledge. (*Com.* v. *Farren,* 9 Allen [Mass.], 489; *Com.* v. *Nichols,* 10 Allen [Mass.], 199; *Com.* v. *Waite,* 11 Allen [Mass.], 264; *Com.* v. *Smith,* 103 Mass., 444; *Com.* v. *Warren,* 160 Mass., 533; *Com.* v. *Vieth,* 155 Mass., 442; *People* v. *Schaeffer,* 41 Hun. [N. Y.], 23; *People* v. *Cipperly,* 101 N. Y., 634; *People* v. *Kibler,* 106 N. Y., 321; *People* v. *Eddy* [Sup. Ct.], 12 N. Y. Supp., 628; *State* v. *Smith,* 10 R. I., 258. See *Com.* v. *Evans,* 132 Mass., 11.)

"The statutes of several of the states provide that certain public officers may enter places where milk is sold, and take and cause to be analyzed samples of the milk sold, and that the result of such analysis shall be admissible in evidence. The decisions construing such enactments are collected in the notes." (1 Am. & Eng. Encyc. of Law, pp. 742, 743 and 744.)

We find the matter discussed in the very horn books of the criminal law so that the merest tyro can become familiar with it. This question is well stated in a little book written for students as follows:

"Doubtless, in the earlier history of the common law, only such acts were deemed criminal as had in them the vicious element of an unlawful intent, acts which were *mala in se,* and indicated some degree of moral obliquity. But this quality has long since ceased to be essential, and at the present day *mala prohibita* acts made criminal by statute, many of them unobjectionable in a moral aspect, except so far as the doing an act prohibited by law may be deemed immoral— constitute no inconsiderable portion of the category of crimes.

"To illustrate: The state prohibits the sale of adulterated milk. A person who sells adulterated milk without knowing it to be adulterated, or even honestly believing it to be pure, is, nevertheless, guilty of a crime. There are many acts which the law, looking to the protection of the community, seeks to prevent making it perilous,

by making it criminally punishable, to do them. As every one is presumed to know the law, every one knows that the sale of adulterated milk is prohibited. No one is bound to sell milk; but if he do, he is bound to know whether it is adulterated or not; and if he intentionally sells milk without having correctly determined beforehand, as it is in his power to do, whether it is or is not of the character prohibited, he is so far at fault, and to that extent guilty of a neglect of legal duty. For the same reason, the sale of a single glass of intoxicating liquor, even for a praisworthy purpose, may or may not be criminal in different jurisdictions, and at different times in the same jurisdiction, according as the legislature, in the interest of the public good, may provide. The hardship of requiring that a person shall know a fact is no greater than to require that he shall know the law. In other words where the statute clearly so intends, ignorance of a fact is no more an excuse than ignorance of law.'' (May on the Law of Crimes, sec. 5.)

The question is discussed and decided by the Supreme Court of Iowa in a luminous opinion from which the following brief extract is taken, to wit:

''It is innocent and lawful to sell pure milk, and it is innocent and lawful to sell pure water; and the argument is that the legislature has not power to make the sale of milk and water, when mixed, a penal offense, unless it be done with a fraudulent intent. But it is notorious that the sale of milk adulterated with water is extensively practiced with fraudulent intent. It is for the legislature to judge what reasonable laws ought to be enacted to protect the people against this fraud, and to adapt the protection to the nature of the case. They have seen fit to require that every man who sells milk shall take the risk of selling a pure article. No man is obliged to go into the business, and by using proper precautions any dealer can ascertain whether the milk he offers for sale has been watered. The court can see no ground for pronouncing the law unreasonable, and has no authority to judge as to its expediency. It is not enough to show that the defendant did not intend to defraud, or that the milk he sold was wholesome. If that were true, almost any law intended to protect the public health and safety might be overthrown. It is enough that adulteration, such as prescribed by statute, may defraud or prove deleterious to the public health or comfort. The legislature may well determine that the adulteration of milk tends to facilitate vicious

practices, and that it ought to be prohibited. To defeat the act prohibiting such conduct it is not enough to show that in the particular case the article sold was innocuous. Criminal intent is not an essential element of the offense described in the statute, and need not be shown in order to justify a conviction. (*Commonwealth* v. *Smith,* 103 Mass., 444; *Commonwealth* v. *Farren,* 9 Allen, 489; *Commonwealth* v. *Nichols,* 10 Allen, 199; *People* v. *Kibler,* 106 N. Y., 321, 12 N. E., 795; *State* v. *Smith,* 10 R. I., 258.) If the statute required knowledge or intent, of course these matters should be shown. These propositions are a sufficient answer to the opinion of the trial court, holding that an intent to defraud is necessary.'' (*State* v. *Schlenken,* 112 Iowa, 642; 84 N. W., 698.) (84 Am. St. Rep., pp. 364, 365.)

In discussing statutes of this kind and the general principle, *Actus non facit reum, nisi mena sit rea,* that there can be no crime without a criminal intent, a distinguished jurist, Mr. Chief Justice Blodgett, of New Hampshire, says:

''It is true that in the earlier history of the common law only such acts were deemed criminal as had in them the vicious element of an unlawful intent, indicating a deviation from moral rectitude; but this quality has ceased to be essential, and now acts unobjectionable in a moral view, except so far as being prohibited by law makes them so, constitute a considerable portion of the criminal code. In such statutes the act is expressly prohibited, without reference to the intent or purpose of the party committing it, and is usually of the class in which the person committing it is under no obligation to act unless he knows he can do so lawfully. Under these statutes it is not a defense that the person acted honestly and in good faith under a mistake of fact. He is bound to know the fact as well as the law, and he acts at his peril. These statutes do not make a guilty knowledge one of the ingredients of the offense. (*State* v. *Cornish,* 66 N. H., 329, 330; 21 Atl., 180, and numerous authorities there cited; *State* v. *Campbell,* 64 N. H., 402-405, 10 Am. St. Rept., 419, and note, 13 Atl., 585; *Commonwealth* v. *Uhrig,* 138 Mass., 492; *Commonwealth* v. *Savery,* 145 Mass., 212, 13 N. E. 611; *State* v. *Smith,* 10 R. I., 258; *State* v. *Huges,* 16 R. I., 403, 16 Atl., 911.)'' (*State* v. *Ryan,* 70 N. H., 196; 46 Atl. Rep., 49; 85 Am. St. Rep., p. 630.)

In a note to the foregoing case contained in the volume last cited, Judge Freeman pertinently remarks:

"One who does a thing forbidden by statute is liable to the punishment imposed, though he had no evil intent, unless the statute makes such intent an element of the crime. If a statute has made it criminal to do an act under peculiar circumstances, one who does it under those circumstances is chargeable with the criminal intent of doing it. (*State* v. *Zichfeld,* 23 Nev., 304, 62 Am. St. Rep., 800, 46 Pac., 802.) One who sells liquor to a minor, though innocently ignorant of the fact, incurs the penalty of the law prohibiting such sales. (*State* v. *Sasse,* 6 S. Dak., 212, 56 Am. St. Rep., 834, 60 N. W., 853.) And in a prosecution for selling oleomargarine, it is not incumbent on the State to show knowledge on the part of the vendor nor an intention to deceive the purchaser. (*State* v. *Rogers,* 95 Me., 94, *ante,* p. 395, 49 Atl., 564.)" (Note to case of *State* v. *Ryan,* 89 Am. St. Rep., pp. 630 and 631.)

Statutes are to be construed and interpreted by well-known rules, sometimes called "canons of construction," about which volumes have been written and able judges have toiled, days and nights, in preparing hundreds of opinions explaining and expounding them. One of the very first and most important of all these rules is to ascertain the intention of the legislature and to follow it. (1 Kent 468 End. Int. Stat., sec. 8.) Our legislature, finding the statute on the subject of selling adulterated milk to be difficult of enforcement and liable to be evaded, amended article 337 of the Penal Code increasing the penalty and plainly interpreting the statute itself and the mode of proof required. (Sess. Acts, 1909, p. 140.) Of course, if courts or judges shut their eyes to the meaning of the law or turn away their heads from the text of the statute they cannot see the legislative intention. But it often stares them in the face when it can be plainly seen by merely looking. Courts ought never, when possible to avoid it, to give a strained or unnatural interpretation to a statute. It is easy to refine away the meaning of the legislature, or by caviling to nullify the plain provisions of a statute. But courts and judges ought, by every possible means, to avoid such practices. Theodore Roosevelt expresses the general opinion of the laity on this question in the following vigorous

words: "A hair-splitting refinement in decisions may result in as much damage to the community as if the judge were actually corrupt." (Outlook Editorials, p. 20.)

Our Penal Code, which originally provided for the punishment of the adulteration of food and of offering adulterated food for sale, was amended, in article 337, by the statute passed on the 11th of last March, which applies especially to the adulteration of milk and exposing the same for sale. To the original section is added among others the following words:

". . . . Shall be punished by a fine not exceeding one houndred dollars or imprisonment in jail not exceeding three months, and in addition to such punishment the adulterated article shall be confiscated. In all cases in which the adulterated article is milk, the person guilty of such adulteration, keeping or offering for sale such article, shall be sentenced to imprisonment for a term of from two to six months and fined from thirty to one hundred dollars."

This amendment clearly gives us a legislative interpretation of the original section 337 in line with the New York and Massachusetts doctrine and according to the general English rule as we have set it forth above.

It is, of course, a general principle of the criminal law, laid down by Lord Coke and followed by many other distinguished judges, that *actus non facit reum, nisi mens sit rea,* which being liberally translated means that "the intent and act must both concur to constitute the crime." Or as it is laid down in the Tolson case (which was a prosecution for bigamy, where a woman married a second time believing her husband to be dead), "in general a criminal intention in the act charged is essential to make the act a crime." (See the matter fully discussed in Broom's Legal Maxims, p. 306.) But this general rule is not inflexible and statutes may be so framed with relation to certain subject matters as to make an act criminal whether or not there has been any attempt to do wrong by breaking the law, or otherwise. Many laws, especially munici-

pal ordinances, such as those regulating the width of streets,
the height of buildings, the thickness of walls, and adjusting
many matters relating to the general welfare of the popula-
tion, the public health and convenience, are properly construed
as imposing the penalty when the act is done, no matter how
innocently, and every man is required to be careful that the
statutory direction is obeyed, and one failing to do so acts at
his own peril. (*Regina* v. *Tolson,* 8 English Ruling Cases, 16
*et seq.* See also the case of *People* v. *Flack,* 11 L. R. A., p.
807 *et seq.* and the lengthy note.) There are then two classes
of cases, one in which the *mens rea,* or guilty mind, is neces-
sary and another in which it is not required. In the latter
class a mere infraction of the law regardless of the criminal
intent is sufficient to incur the penalty. But it is contended
that a prosecution under section 337 of our Penal Code be-
longs to the first class and a guilty mind is necessary to make
an offender. But even conceding, to clarify the discussion if
you choose, that there are two classes of statutes, one in which
the guilty intent constitutes a part of the offense and another
in which such intent is not necessary and the offense is com-
plete without it, and that our statute properly falls within the
first class, and that the statutes of England, New York and
Massachusetts are included in the second class, still the propo-
sitions maintained by counsel for appellant, and sustained by
the majority of this court, are not properly established. It
is plain to be seen, on slight reflection, that the malice and the
fraudulent intent are shown *prima facie* to exist when the
possession of adulterated milk and the offer of the same for
sale, in his shop, by the milk dealer are properly proven by
satisfactory evidence. The law does not require the prose-
cuting officer to follow the cows home from the pasture, to
watch the graceful performance of "Milly, the maid, with the
milking pail," or to mount the milk wagon and accompany
the rural swain to the market, and stand guard over the em-
ploye of the accused, in order to prove to the trial court that

none of these guileless peasants and laborers were guilty of tampering with the milk cans or adulterating the lacteal fluid, to make a case against the milk vendor. But this is apparently the contention of the defendant's counsel; and he is, as it seems, virtually sustained therein by the majority opinion which has been written and adopted herein. No man can penetrate the mysteries of the human heart and expose to view the motives, malicious or fraudulent on the one hand, or upright, guileless and virtuous on the other, that there prompt the actions of mankind. The motives of the actor must be judged by the actions themselves. The great Master himself says, "By their fruits ye shall know them. Do men gather grapes of thorns or figs of thistles?" (Matt. vii., 16.) Legal malice being merely the absence of a legal excuse or justification for an act done in violation of the law, it can be shown in any proper manner. To perform labor on the Sabbath, which was punished with death by the law of Moses, is not in itself an essentially criminal act; but, being prohibited by the laws of many of our States, the mere performance of the act of Sabbath breaking may indicate and prove the state of mind termed in the law as willful or malicious. Of course, this offensive quality can be eliminated from the act denounced by the law as malicious or fraudulent by showing the act done on the Sabbath day to have been one of necessity, devotion or mercy, or some other legal excuse or justification. The difference between the proof required, in prosecutions under the two classes of statutes referred to above, is that in the second class the offense is conclusively shown by the proof of the possession of the adulterated article, while in the first class the offense is only shown *prima facie* and the defendant is allowed to prove, if he can, the absence of fraud or malice in the act constituting the violation of law. Or it may be said that in the first class of cases the inference drawn from the possession of the adulterated milk is one of fact and in the second class of cases it is one of law. (1 Bouvier Law Dict., 735.)

The question presented in this case for decision involves only a rule of evidence, and the interpretation which I give to the statute does not infringe on the presumption of innocence nor ignore the malicious or fraudulent intent with which the article is sold or offered for sale. The law, as we understand it, simply regards the fraudulent intent as proven *prima facie,* and the presumption of innocence is removed when the possession and exposition for sale of adulterated milk is brought home to the defendant. This is not only reasonable, but is right and just. It is the only construction of the statute which gives effect to the clear intention of the legislature, and is therefore the one which duty impels us to follow. (1 Kent's Com., 468; *Parkinson* v. *State,* 14 Ind., 184; 74 Am. Dec., 529.)

The possession of stolen goods recently after the commission of the theft is a circumstance from which, if unexplained, the possessor may be properly presumed to be the thief. This is not a presumption of law but a presumption of fact. It is a circumstance from which the jury or the judge trying the case can infer the guilt of the accused. Any person found in possession of a diamond ring recently stolen must be prepared to show, to the satisfaction of the court, how he acquired it. This he may possibly do by his own testimony, if it is credible; but until such possession is explained it brands him as a thief. (*McNair* v. *State,* 14 Tex., App 83; *Garcia* v. *State,* 26 Tex., 210; 81 Am. Dec., 605; *Lehman* v. *State,* 18 Tex., 177; *Matlock* v. *State,* 25 Tex., App. 657; *Lee* v. *State,* 27 Tex., App. 476, 477.)

Then we must regard the rule of our law to be that the presumption of innocence which attends the accused up to the time he pleads to the accusation is rebutted by proof that he has in his possession, and is offering for sale as pure, milk which is found to be adulterated. And from the fact that he has better opportunities than anyone else to know whether or not the article in which he deals is pure or adulterated, the law

imposes on him the duty of knowing such facts, and hence the guilty, malicious and fraudulent intent to injure, deceive and defraud his customers can be inferred. It is well settled, as everybody·knows, that legal malice is not hatred or ill-will, but the absence of a legal excuse or justification for the illegal act done by the defendant. So it is that from the illegal act itself can readily be inferred, as a fact by the court or jury trying the case, the fraudulent intent to deceive the public and the wanton and malicious disregard of the health of his customers. The criminal intent is always to be inferred from the commission of the forbidden act. The general rule is that if it is proven that the accused committed the illegal act, with which he is charged, it will be presumed that he performed it with a criminal intent, and it is incumbent upon him to rebut such presumption by pertinent proof. (*Hoover* v. *State,* 50 Ala., 57; *Cole* v. *State,* 10 Ark., 318; *Fletcher* v. *State,* 49 Ind., 124, 19 Am. Rep., 673; *State* v. *Jones,* 70 Iowa, 505, 30 N. W., 750; *People* v. *Carter,* 96 Mich., 583, 56, N. W., 79; *Johnson* v. *St.,* 35 Tex. Crim., 271.)

The proof is clear and uncontradicted that the defendant, on a certain day in the month of May last, in his shop at Aguadilla, had in his possession adulterated milk, which he was offering for sale as pure. This is all that was necessary to be proven by the prosecution to sustain the allegations in the information. The defendant failed to show any extenuating circumstance, or to fix the offense on any other guilty agent, or to negative a criminal agency or guilty knowledge on his part, or to bring forward the least fact tending to show his innocence. Certainly the record shows him to be guilty as charged. He should not escape punishment.

Taking these views of the law and the facts found in this record, I must arrive at the conclusion that the judgment of the trial court should be affirmed.

CONCURRENT OPINION OF MR. JUSTICE FIGUERAS.

This is an appeal from a judgment in a criminal prosecution for the adulteration of milk.

It is governed by the Act of the Legislative Assembly of Porto Rico, approved March 11, 1909. The undersigned justice has generally dissented, and in this special case concurs in the opinion of the majority of the court. This, at first glance, appears to be contradictory, but I shall explain.

I am of the opinion that the statute above cited establishes a clear distinction between provisions of the first and second sentence thereof.

In the first sentence it expressly requires a fraudulent purpose on the part of any person in the cases enumerated, and later fixes the punishment therefor. It does not speak of a fraudulent purpose and only says that "in all cases in which the adulterated article is milk, the person guilty of such adulteration, keeping or offering for sale such article shall be sentenced," etc., etc.

If the legislature had considered them the same, and if it only intended to separate them in order to fix a special punishment in cases of the adulteration of milk, it would have said, after the word "confiscation," which is the last word in the first sentence, "and in all cases in which the article is milk the punishment shall be," etc., etc.

Section 18 of the Civil Code reads as follows:

"The most effectual and universal manner of discovering the true meaning of law, when its expressions are dubious, is by considering the reason and spirit thereof, or motives which induced its enactment."

Aside from the difficulty, not to say impossibility, of proving a fraudulent purpose in this case, it must be borne in mind that milk is an article of absolute necessity, used principally as a food for children and invalids, and that the adulteration thereof may cause serious injuries to the public health, which must be avoided at any cost by the Government, by means of

laws imposing severe punishment upon the unscrupulous adulterators of food.

These reasons, that of fixing a more severe punishment, as may be seen in the second sentence, and in the third under the word "provided," and the fact that upon the introduction, passage and approval of this law the adulteration of milk had become so universal that it was the ordinary and usual kind of milk to be found, together with other reasons perhaps of greater importance, undoubtedly impelled the legislature to refrain from requiring proof of the existence of a fraudulent purpose in a person guilty of the adulteration of milk, it being sufficient that the article be adulterated, that it be so offered for sale, or that it be actually sold as pure.

This is the only way to prevent the public from being cheated and at the same time to prevent the consumer from being slowly poisoned by the daily use of such food.

Otherwise, in view of the impossibility of proving the existence of a fraudulent intent, I feel that it would be licensing the unscrupulous speculators, who constitute the majority, to continue the sale of adulterated milk.

Construing this law together with section 18 of the Code, I am forced to the conclusion that the adulteration of milk is covered by the statute as a particular case, and that it is not necessary to prove a fraudulent purpose, but that it is sufficient to prove that the milk is adulterated and that the person guilty of the adulteration has it in his possession for sale or actually sells the same, and that the punishment provided for by the same law is applicable to the case.

This is the explanation for my general dissent from the opinion of the majority of my colleagues.

But in the information in this case it is alleged that there was malice and a fraudulent intent on the part of the accused, and this is an imputation of a most personal character, and it is plain that the accused went to trial in the belief that an attempt would be made to prove that allegation, and in the

certainty that proof thereof was impossible he perhaps failed to use certain means of defense.

And here again I have explained why I concurred in the opinion of the majority in this special case reversing the judgment appealed from.