Howry, J.,
delivered the opinion of the court:
The Imperial Government of China provided and set apart an indemnity fund for the benefit of certain signatory powers (which included the United States) growing out of the disturbances created in China by subjects of that Empire, known as the Boxers.
By a final protocol dated September 7, 1901, agreed upon and signed by the plenipotentiaries representing the international Governments in interest, the Emperor of China agreed to pay indemnities to the Governments, societies, and individuals (which afterwards was construed to include companies and corporations) who had suffered losses in person or in property during what is known and has passed into history as the Chinese Boxer troubles.
*565 The total amount claimed by or on account of the United States for their citizens, including companies and corporations, was $3,308,036.18, of which amount $1,994,929.18 was allowed by commissioners and our Department of State. The sum of $1,313,107 was finally disallowed or withdrawn.
By public joint resolution approved May 25, 1908, 35 Stats., 577, Congress provided that within one year from the passage of the act any person whose claim upon the Chinese indemnity of 1900 had been presented to the United States commissioners or to the Department of State and disallowed, in whole or in .part, might present the same, by a petition, to this court. The court was then invested with jurisdiction to hear and adjudicate such claim, without appeal, and to render such judgments * * * in addition to any allowance or allowances theretofore made. The full terms of the joint resolution are set forth in the margin.[1]
*566 The American Trading Co. had been, engaged principally in carrying on an international brokerage, forwarding, and commission-house business in China. Its capital and credit were principally employed in the purchase of various classes and kinds of articles and commodities specifically ordered through its branch officers or agents, by customers domiciled or doing business elsewhere than in the United States, and in the forwarding of the articles so ordered and purchased through or in the care of its branches to such customers or purchasers.
Among the claims submitted to the original commission was one in behalf of plaintiff aggregating the sum of $365,278.01. The commissioners allowed $97,671.11, and disallowed items of the claim aggregating the sum of $267,606.90.
The amount recovered by plaintiff from goods sold and debts collected subsequent to the filing of the claims and before the awards were rendered by the commissioners was $81,294.68; the claims rejected and disallowed amounted to $186,312.22, which sum was reduced by the sum of $39,253 subsequently recovered by claimants from original debtors, on account of certain of the items so disallowed, leaving a balance of $147,059.22, for which sum plaintiff made claim with interest in its petition filed in this court on May 21, 1909. Since the date of the filing of the petition and the taking of testimony the claim has been further reduced by the abandonment of several items amounting in the aggregate to $21,245.72, thereby leaving a total amount of $125,813.50. Interest is claimed on this amount at 7 per cent per annum, for which judgment is asked.
Plaintiff states that our Government has not undertaken to dispute in any particular the truth or-bearing of any of the evidence. The fact that in a claim against the fund *567 evidence could not be procured and that like many other cases where claimants are interested in the result and Governments are not so nearly interested; and that Government representatives learn (especially after so many years) that witnesses are not in existence, but if found are unwilling to speak, imposes the necessity of an unusual degree of circumspection and care on this court in weighing such evidence as plaintiffs have offered. No court whose duty it is to find the facts of a case can close its eyes to probabilities created by circumstances and blindly follow every statement made by those whose interests are at stake. Sometimes evidence lacks distinctness and precision so much as to suggest a weakening of the memory through lapse of time. The age of a claim, •and the meagemess of testimony offered to substantiate it are sometimes sufficient to authorize rejection, as in Stone v. United States, 29 C. Cls. R., 111; 164 U. S., 380, where there was no imputation that witnesses had sworn falsely, but where the testimony from a variety of circumstances, was held to be insufficient. We advert to these considerations not by way of reflecting upon plaintiff and its agents who have presented the claim, but to say that the failure of those whose duty it is to defend to obtain evidence affords no reason for the court to regard the omission as having any bearing in determining the nature and amount of the losses alleged.
There is reason appearing from this record why the court can not accept inconsiderately everything interested parties have put before us to sustain their claim because of surrounding circumstances and likewise because of the reasons assigned by our commissioners in China for some of their disallowances. Thus, one of plaintiff’s agents (the same who opened the Tientsin branch in 1898 and continued there till December, 1904) testified that the commissioners disallowed a part of the company’s claim because certain goods, sold to a customer which had been destroyed were not on the company’s premises. But the commissioners reported that the item was disallowed because when the claim was presented by the company this debtor was not insolvent.
Except for such losses as come within the intent and meaning of the jurisdictional act the court can not of course con *568 sider anything. Certainly we are obliged to put entirely out of mind the violent character of the Boxer uprising, which counsel for plaintiff say should not be done, although they admit that the character of the transactions is possibly of no present consequence. Whether the destruction of property was wanton and whether the Empress Dowager promulgated edicts against foreigners, as plaintiff alleges, and regardless of the causes that led up to war or threatened hostilities, either or both, according to what the disturbances were, nothing offered by plaintiff is necessary to be inquired into except the character and time of the losses alleged and the law applicable to the proofs in the record.
When commissioners were appointed to pass upon claims •against China in that country, such demands included claims for goods destroyed, for losses through breach of contracts, through the death, disappearance, or insolvency of Chinese debtors, through the general interruption of business, depreciation in value of stock, and for extraordinary cost of storage and insurance. Compensation was allowed for the actual value of goods destroyed as of the time of destruction. Interest was allowed on certain contracts. Three classes of claims were disallowed: (1) "Where the contracts appeared to be capable of fulfillment through the continued solvency of the parties; (2) where losses were claimed by reason of the general interruption of business; (S) where claims had been made for interest upon capital invested in goods for sale in open market and not contracted for specific delivery.
In presenting the present claim there appears in the brief of counsel the statement that it was recognized, and was reported by the commissioners, that many of their awards might “ be lacking in the accuracy which results from judicial investigation.” The full report of the commissioners appears to have been that the awards were “largely and necessarily based on ex parte evidence, and may be lacking in the accuracy which results from judicial investigation. Yet, on the part of payments generally, the commissioners have met with a spirit of candor and fairness which, while greatly lightening their task, also enhances the confidence with which their report is submitted.”
*569 The principles adopted for the settlement of these Chinese claims emanated from our own Government. The American commission acting under the instructions of our Secretary of State provided indemnity in each case for such damage as “ should be ’ fully and substantially compensatory, while excluding all merely speculative or imaginary claims or elements of damage.” By the approval of the report of the commissioners it will be observed that the executive department of our Government sanctioned all disallowances for losses arising out of interruption to business.
When the matter of providing for hearings in this court was first considered in Congress there was a belief that equitable indemnities had not been allowed “ under the rulings of the commission as sustained by the Department of State.” That appears from a committee in Congress, who had declared that it was the duty of Congress “ to see that equitable indemnities for losses clearly sustained, not of a speculative character,” should be paid, and that damages should be assessed with a view to putting * * * companies and private individuals back in the position in which they would have been if the antiforeign movement of 1900 had not taken place, in so far at least as this court might in equity be able so to do. (H. R. Rep. 1107, 1st sess. 60th Cong., Com. on For. Aff.) But the jurisdictional act did not go further than to provide that the Court of Claims should be “ invested with jurisdiction to hear and adjudicate each claim, without appeal, and to render such judgments de novo, or in addition to any allowance or allowances heretofore made, as in each case shall be fully and substantially compensatory for actual losses and expenses of the claimant caused by the antiforeign disturbances in China during the year 1900, excluding merely speculative claims or elements of damage.”
As the statute, and the statute alone, fixed the rule (and not the report of the committee), we are to be guided by the intent of the statute, and this intent is first to be gathered from the words of the law. If we can look to the committee report recommending the course of procedure as an aid in determining the intent, we find very little difference, if any, between the original instruction of the executive de *570 partment as to the quantum of damages and the intent of the legislative department as expressed in the law.
The court is of opinion that the following items should be allowed, to wit: On the first item (5), for loss of exchange through error of an agent at Tientsin, which had been withdrawn from the consideration of the commission. This amounts to $576.49 (847.78 taels), with interest at 7 per cent per annum from June 7, 1901. Item 3 (5), for destruction of business of Hung H. Ye, which occasioned an immediate loss to plaintiff of $737.12 (1,084 taels), with interest from November 30, 1900. Item 3 (c), for goods sold at a loss to others than consignees, $22,173.51 (32,608.11 taels), with interest from July 1, 1901. This loss had been disallowed by the commissioners for the reason that the goods were supposed to be still on hand or in transit or in storage at the time of the award. But subsequently data was obtained sufficient to establish the claim under the act of our jurisdiction. Item 8, for $550.87 (810.10 taels), with interest from August 7, 1900. This item covers interest on bills for delayed goods.
Counsel representing the fund concede in their brief the correctness of the foregoing amounts. The four items so stated clearly fall within the rule of damages laid down in the jurisdictional act.
This brings us to other items, and, necessarily, to the more critical consideration of the jurisdictional act.
The second item is for goods alleged to have been looted. and burned on the premises of Yuen Chi Yung, valued at $4,254.08 (6,256 taels). The commissioners disallowed this claim because the debtor was “ not insolvent.” The goods had been sold and delivered to Yuen Chi Yung and held in his godo'wn. They had been sold on 60 days’ time, and between the period of delivery and the maturity of the account the uprising occurred and the goods were destroyed. But Yuen Chi Yung was still in business and liable under his contract of purchase to pay for the price of the goods. Plaintiff continued to do business with him for a period of about four years. The vendee has never been declared insolvent by any competent tribunal. He was, doubtless, unable to pay his *571 debts at the time he ceased to engage in trade, and it is equally probable that he was never at any time such a prompt customer as to make his trade desirable. But he was solvent, so far as the evidence shows. The evidence offered does not overturn the finding of the commissioners as to the solvency of Yuen Chi Yung. The court can not say, from the evidence, that the Boxer uprising caused any loss to plaintiff on this item. Evidently plaintiff had losses in the course of business, like all other persons engaged in trade, and to the court it seems that the fund.is not to be charged with an incident like this because of the unusual circumstances created by the disturbances. Assuredly the fund provided could not be invaded to pay plaintiffs for losses arising in the ordinary course of business.
The third item (a) grew out of alleged loss on Yuen Ch’ong certificates of deposit amounting to $21,760 (32,000 taels). It seems that Yuen Chi Yung owed plaintiff 60,000 taels at the time of the uprising. Part of this sum is made up of item 2 and the 32,000 taels herein claimed. In December, 1900, plaintiff’s agent accepted as collateral security for a part of this indebtedness five certificates of deposit uttered by the Yuen Ch’ong Bank to Chih Ch’eng Hsing, but which had been duly assigned to Yuen Chi Yung in the regular course of business. The bank defaulted, and the certificates were not collected; but in 1901 judgment was rendered in favor of plaintiff, by a provisional court, against the bank. Meantime Yuen Chi Yung discontinued business, and at the time of the discontinuance the debt for which these certificates of deposit were given as collateral security remained unpaid. But all this time plaintiff was doing business with Yuen Chi Yung, and then it was that the loss may be said to have been incurred. Whether the bank’s default was occasioned by the Boxer uprising does not appear. It may have been that the failure of the bank was one of the contributing causes that carried Yuen Chi Yung out of business. In view of the fact that plaintiff sold Yuen Chi Yung goods after the Boxer troubles and received payment from time to time on account, the court is of opinion that the evidence does not justify a charge against the indemnity fund on this account.
*572 The fourth item grows out of a rifle contract, and is for $6,377.37 (9,378.49 taels). This item is conceded in part and denied in part. Without entering into the particulars and the matter of interest on the total cost of rifles, and the duty of allowing interest on the payment made as bargain money on account of the contract price, the court is of opinion that there should be a recovery for $5,986.18 (8,803.20 taels), with interest from September 5, 1908.
The fifth item is for commission due on sales of piece goods and is for the sum of $758.04 (1,114.77 taels), with interest thereon from December 31, 1901.
The sixth item (b) is for goods sold to Shanghai merchants at loss of commissions, amounting to $1,844.57 (2,712.60 taels), with' interest from September 3, 1901.
These two items will be considered together. The court is of opinion that both of these items were a part of the profits earned by plaintiff during the year 1900 and should be allowed.
This brings us to the question as to what allowance, if any, can be made for interruption to business and to the case on the large sum claimed as the plaintiff company has made it. The question is not free from difficulty, and certainly as to amount there is some uncertainty, which in itself raises the difficulty in the application of the law to the facts.
Congress knew the speculative character of the claims that had been presented to the commissioners when the jurisdictional act was passed, and with perfect knowledge of the character of the demands the lawmaking body excluded from consideration claims involving speculative elements of damage. Practically conjectural damages were forbidden to be allowed. The special act apparently left the court with authority and jurisdiction to measure the damages on such items by the ordinary rules of law for measuring damages strictly for compensation.
The authorities are not uniform in estimating damages. Anticipated profits were held not recoverable by a shipowner in case of collision, Smith v. Condry, 1 How., 28. But this was denied in The Morning Star, 4 Biss., 72 Fed Cas., and subsequently explained in The Mayflower, Fed. Cas. No. *573 9845, and distinguished in Harrison v. Stewart by Taney, Ch. J. This and a great many other references to cases appear in the books. (3 Dig. U. S. Sup. Ct., 2503.) The anticipated profits of a mill owner from grinding wheat into flour and selling the same, which he would have made had the mill been completed at the time agreed upon in a contract for the construction were held not recoverable as damages for the delay, Howard v. Stillwell, 139 U. S., 199. Subsequently this case was distinguished, 42 C. C. A., 331, and many cases follow along the same and different lines in numerous courts. These authorities appear to be collected and speak for themselves in 3 Dig., 2503. The probable profits of a voyage were held not to afford any just basis for the computation of damages in case of marine trespass, beginning with the Amiable Nancy, 3 Wheat., 546, La Amistad de Rues, 5 ib., 385. These cases were cited in many other decisions, and they appear to be collected in the books as coming from various States as well as in the subordinate courts of the United States and the Supreme Court. It is therefore unnecessary to review them.
On the other hand, there is a considerable number of cases which establish an exception to the general rule. In a leading case, which seems to have formed the basis of subsequent decisions in many courts, it was well said that “ the line of mere authority upon questions of damages, like that here presented, if any such line can be traced through the conflict of hostile decisions, is too confused and tortuous to guide us to a safe or satisfactory result, without resort to the principles of natural justice and sound policy which underlie these questions, and which have sometimes been overlooked or obscured by artificial distinctions and arbitrary rules.” Allison v. Chandler, 11 Mich., 542. In Griffin v. Colver 16 N. Y., 492, the doctrine declared by Sedgwick that the law aims not at the satisfaction but at the division of the loss, was repudiated, and the Michigan case approved it. The facts of that case grew out of so interfering with a tenant, by tearing the.roof off the leased premises, as to force the plaintiff to leave his store and hire another where his business was not nearly so good. In Central Coal & Coke Co, *574 v. Hartman, 111 Fed., 96, Hartman had claimed that the defendant had inflicted damages upon his business by violations of the Sherman antitrust law and had made it impossible for him to make contracts for the future delivery of coal. Plaintiff produced no proof to show the number of customers or the amount of custom he had lost, or from which such loss could be lawfully inferred, nor any proof upon which to base a fair conjecture as to the amount of his loss. The court adopted the reasoning in the preceding cases. In Chapman v. Kirby, 49 Ill., 211, which is a repetition of -a statement from a noted textbook on damages, 1 Sedgwick {sec. 182), it was said that when a party is deprived of his business by slander, compensation for the loss may be recovered, and such losses may include profits that would have been made had the act not been performed by the other party. In District of Columbia v. Woodbury, 136 U. S., 450, the Supreme Court dealt with an action for personal injuries brought by a physician who claimed damages because of his inability to practice his profession by reason of the injuries, and declared that no fixed rule could be prescribed for measuring the amount of damages, in which the result must of necessity depend upon the good sense and sound discretion of the jury as controlled by the special circumstances proven. In Fifth Baptist Church, 108 U. S., 335, the Supreme Court-declared that there could be no arithmetical rule for the estimating of damages. In Central Trust Co. v. Clark, 92 U. S., 393, it was held that the damages must not be dependent upon numerous and changing contigencies to such an extent that their amount be not susceptible of proof with reasonable certainty. In City of Memphis v. Brown, 20 Wall., 318, the Supreme Court (stating a general rule) said that the principles and ideas there could not be reduced to a money standard and therefore could not be the subject of legal calculation in dollars and cents. In Phillips v. Seymour, 91 U. S., 646, the rule was declared that where there was nothing on which a jury could do anything but conjecture and speculate it would be at the hazard of sacrificing truth and justice.
As a result of an examination of many of the authorities, which the researches of counsel have presented and which *575 the diligence of the conrt has been able to supply, the court is of opinion that the true rule is to be found in the statement that the damages to be recovered must always be the natural and proximate consequence of the act. Indeed, textbook writers like Sedgwick and Grreenleaf make this a fundamental proposition on the subject. As an exception to the general rule, the court is further of opinion that in a case like this expected profits of a business, when clearly proven, can be allowed. That where there is a basis that does not lead the court too far into the realms of conjecture it is just to allow damages for the act of a wrongdoer where profits have been diminished.
The remaining two items, 3d, for $20,400 (30,000 taels), and (6a) for $46,581 (68,502 taels), cover losses on general business alleged to have been suffered at Tientsin and Shanghai. In presenting their claim to the commission, more than two years after the outbreak, plaintiff stated this part of their claim as loss of business and extraordinary expenses incurred at Shanghai in its efforts to effect deliveries of cargoes, and to obtain payment therefor, by reason of the demoralized conditions of trade and the failure and departure of native merchants. The figures given then were admitted by the company to be “ necessarily estimates,” and that there was no method by which it could be computed to “ absolute certainty ” just what the losses had been. The company included in its demand losses for “ accepting short payments and canceling charges for commission, storage, fire insurance, interest,” etc. In the award rendered by the commission it was stated that the damages claimed by the third item was for losses on general business and that a comparison was made between the volume of business done by the company from June 1, 1899, to May 31, 1900, with the volume done from June 1, 1900, to May 31, 1901; that an average commission on the decrease is claimed to represent the amount of damage done on the general interruption of trade, and to this had been added by the company a large amount for allowances to native dealers to effect deliveries of goods. Then followed the statement by the commission that the ■damages thus claimed were contingent and speculative. The differences between the company and the commissioners fur- *576 nisb a strong illustration of the difficulties involved upon the merits of this part of the claim.
Plaintiff’s main business was at Shanghai, with a branch at Tientsin. The income was derived from commissions on exports and imports, but, plaintiff was not doing a jobbing or trading business at Tientsin. The business there was solely a commission-house business. The record justifies the concession of the defense that whatever business was done at Tientsin swelled the earnings of plaintiff for 1898-99. The branch business done at Tientsin had only been under way about two years at the time of the outbreak, but plaintiff contends that but for the interruption the Tientsin agency would have done a large amount of business in 1900, but in 1901 there was in fact a very considerable increase in the business. The disturbances of the previous year were undoubtedly contributing causes of this increase. The Shanghai business had not suffered largely, because that city had not been under the influence of the Boxers. Considerable local trade had been going on in that vicinity prior to the complete restoration of tranquillity. While there was a finding by the commission that order had been restored in China in about a year from the beginning of the outbreak and that the usual channels of trade were fully open at the expiration of the year, it must not be forgotten that some trading had been resumed prior to the recognized peace, and some traders-had profited by it. Among those were plaintiffs, as we think. We have shown that at Shanghai the interruption to business was not so great as at other places.
An estimate has been made by both plaintiff and defendants as to the profits anticipated but lost. The plaintiff,, in making up its claim, seeks to treat the business of Shanghai and Tientsin as two separate entities and to compute its. losses separately. As a basis for Shanghai it has taken the business done at that place for five calendar years prior to 1900 and for Tientsin as a basis it has taken the business there not only before the uprising but for some time, after-wards, to wit, from October, 1898, to May 31, 1902. But the court has reached the conclusion that in determining the average annual earnings of the company for the purpose *577 of arriving at the amount of profits and probable losses sustained by claimant, the calendar year should be used as the unit, and that all the business of the company carried on in China should be merged in making the estimate and only the business done for the five years next preceding the year of the uprising should be considered.
The main business at Shanghai was well established not only for the five years preceding the uprising' but for some years before, but the books of the company covering the period prior to 1895 had been destroyed and for that reason the court is unable to make an estimate of the Shanghai business except on the basis of what business had been done during the five years immediately preceding the uprising.
The Tientsin branch had been in operation a little less than two years at the time of the uprising — that is, from October, 1898 — and prior to that time all Tientsin business had been done through the Shanghai office and was included in the Shanghai business. The earnings of the Shanghai office included the New York office transactions for the period of five years preceding the uprising. . The business done at Shanghai likewise included the London, Hamburg, Yokohama, and Kobe offices from 1898 to the year 1900. With this period of five years we have a better and clearer view of what was being done at each place. It appears from the proofs that the earnings of all the offices were comparatively small in comparison with those of the Shanghai and New York offices.
Accordingly, wre have taken the amount of business done, as appears by the books of the company, at Shanghai for the five years prior to 1900 and the business done at Tientsin for the period prior to June 1,1900, as a basis upon which to compute the average annual earnings of the company, and from the average annual earnings thus obtained have deducted the earnings of the Shanghai office for the year 1900 in order to arrive at the losses suffered by claimant on its China business.
Plaintiff has taken into account in its computations the 14,576 taels which were earned on Tientsin business from June 1, 1900 (two weeks before the Boxer disturbances be- *578 same acute), to May 31, 1901 (some three months after the uprising may be said to have subsided), but the court has eliminated this item in its computation for the reason that the greater portion, if not all, of this amount must have been earned after March, 1901.
The computation on the item of losses on general business is as follows:
Earnings in China:
1895, 127,746 taels.
1896, 151,267 taels.
1897, 170,136 taels.
1898,136, 605 taels, including 6,389 taels at Tientsin to May 81, 1899.
1899, 165,035 taels, including 15,544 taels at Tientsin to May 31, 1900.
5)750,789 taels, total earnings in China.
150,157. 8 taels, average annual earnings.
96, 742 taels, earnings for 1900.
Difference, 53,415.8 taels, at 68 cents, equals $36,322.74, with interest at the commercial rate.
On the whole case the result may be tabulated as follows:
Loss. Interest. Total.
item lb. §576.49 §443.45 $1,019.94
item 3b. 737.12 693.81 1,330.93
Item 3c. 22,173.51 16,952.88 39,126.39
Item 4.. 5,986.18 1,569.04 7,555.22
Item 5.. 758.04 553.03
Item 6b. 1,844.57 1,388.04 3,232.61
Item 8.. 550.87 455.87 1,006.74
Item 6a.
Item 3d
|
36,322.74 27,770.75 64,093.49
68,949.52 49,726.87 118,676.39
Judgment will be entered in favor of claimant for the sum of $118,676.39.

 Resolved by the Senate and Souse of Representatives of the Suited States of America in Congress assembled, That the President is hereby authorized to consent to a modification of the bond for twenty-four million four hundred and forty thousand seven hundred and seventy-eight dollars and eighty-one cents, dated December fifteenth, nineteen hundred and six, received from China pursuant to the protocol of September seventh, nineteen hundred' and one, for indemnity against losses and expenses incurred by reason of the so-called Boxer disturbances in China during- the year nineteen hundred, so that the total payment to be made by China under the said bond shall be limited to the sum of thirteen million six hundred and fifty-five thousand four hundred and ninety-two dollars and sixty-nine cents and interest at the stipulated rate of four per centum per annum, and that the remainder of the indemnity to which the United States is entitled under the said protocol and bond may be remitted as an act of friendship, such payment and remission to be at such times and in such manner as the President shall deem just: Provided, That within one year from the passage of this resolution any person whose claim upon the Chinese indemnity, nineteen hundred, was presented to the United States commissioners or to the Department of State and disallowed in whole or in part may present the same by petition to the Court of Claims, which court is hereby invested with jurisdiction to hear and adjudicate such claim, without appeal, and to render such judgments de novo, or in addition to any allowance or allowances heretofore made, as in each case shall be fully and substantially compensatory for actual losses and expenses of the claimant caused by the antiforeign disturbances in China during the year nineteen hundred, excluding merely speculative claims or elements of damage: And provided also, That the sum of two million dollars be reserved from the Chinese indemnity, nineteen hundred, for the payment of such judgments, the same to be paid by the Treasurer of the united States as and when they shall be certified to the Secretary of the Treasury by the said court, and any balance remaining after all such claims have been adjudicated and paid shall be returned to the Chinese Government in such manner as the Secretary of State shall decide, and the Secretary of the Treasury is hereby authorized and directed to so Teturn the same: And provided further, That all evidence furnished by the claimants, and statements made by them to the said commissioners or to the *566 Department oí State, shall be transmitted by the said department to the said Court of Claims and considered together with such other additional testimony as may be presented by either side, and the Government of the united States shall defend the said claims in the said court by such attorney or attorneys as may be designated for such service by the Attorney General of the united States: Provided further, That in no case shall the Court of Claims award a principal sum to any claimant which, together with the principal sums said, claimant may have already received by decision of the united States commissioners and the Department of State, shall exceed the amount originally-claimed by said claimant.