**Viola CHVALA, Administratrix of the Estate of Victoria Krizman, Deceased, Appellant,**

v.

**D. C. TRANSIT SYSTEM, INC., Appellee.**

**Ann BAKER, Appellant,**

v.

**D. C. TRANSIT SYSTEM, INC., Appellee.**

**Nos. 16849, 16850.**

United States Court of Appeals District of Columbia Circuit.

Argued May 9, 1962.

Decided June 21, 1962.

Mr. Francis J. Ortman, Washington, D. C., with whom Mr. Arthur E. Neuman, Washington, D. C., was on the brief, for appellants.

Mr. Frank F. Roberson, Washington, D. C., with whom Mr. Jeremiah C. Collins, Washington, D. C., was on the brief, for appellee.

Before FAHY, WASHINGTON and DANAHER, Circuit Judges.

FAHY, Circuit Judge.

Victoria Krizman and Ann Baker were passengers in an automobile owned by Ernesto Regalado, and driven by Carlos Sauma. As the automobile was going north on Wisconsin Avenue in the dark hours of the early morning of January 12, 1957, it struck a streetcar loading platform and veered into a tree. Vic-

toria Krizman was killed, and Ann Baker was injured. Appellant Chvala is Victoria Krizman's administratrix. She and Ann Baker sued the appellee, D. C. Transit System, Inc., and Regalado and Sauma. We are now concerned only with the suits against Transit.

Appellants claimed Transit was negligent in failing properly to maintain, mark and light the platform, and that its negligence in these respects was a proximate cause of the accident. At the conclusion of their counsel's opening statement to this effect, given in more detail but well within the scope of the complaints, the trial court, on motion of Transit's counsel, directed verdicts for Transit. Upon these verdicts the court entered judgments for Transit, from which Chvala and Baker appeal.[1]

The theory of Transit is that insofar as the carloading platform is concerned Transit owed no duty to persons using the street by automobile. The responsibility in that connection, Transit contends, rests upon the District of Columbia under the rule of the common law that the municipality is responsible for the condition of the streets. Transit cites District of Columbia v. Sullivan, 11 App. D.C. 533 (1897) and Dotey v. District of Columbia, 25 App.D.C. 232 (1905). Also relied upon is Radinsky v. Ellis, 83 U.S.App.D.C. 172, 167 F.2d 745, and Webster v. Capital Transit Co., 91 U.S. App.D.C. 303, 200 F.2d 134.

In Sullivan the suit was against the District of Columbia, which unsuccessfully interposed as a defense that the proximate cause of the accident was the act of the street railway company "in running against the plaintiff" while she was on a sidewalk which apparently was in such proximity to the tracks that the running boards of the street railway cars projected over the edge of the sidewalk. Rejecting the contention that the District was relieved of liability the court, leaning upon Barnes v. District of Co-

1. For prior history of this case, not pertinent to this appeal except to help explain the time lapse, see Chvala v. D.C.

Transit Sys., Inc., 110 U.S.App.D.C. 331, 293 F.2d 519.

lumbia, 91 U.S. 540, 23 L.Ed. 440 and District of Columbia v. Woodbury, 136 U.S. 450, 10 S.Ct. 990, 34 L.Ed. 472, pointed out that the District has the care and charge of, and the exclusive jurisdiction over, the streets and avenues of the City. Without passing upon the question of the company's liability, the municipality was held to be primarily liable, the court saying in part:

> "the Commissioners of the District were given express authority, by the acts of Congress, to supervise and direct the location of the electric road within the limits of the highway or street, with a view to public convenience and safety, and they certainly had a right to prevent the use of running boards on the cars that would project over the sidewalk to the peril of passengers, to say nothing of the defective construction of the sidewalk itself, erected after the railroad was located and in operation." 11 App.D.C. at 542–543.

Dotey was also a suit against the District, for damages due to personal injury caused by its alleged negligence in permitting a defective condition—a projecting waterplug—in a public sidewalk. The court said that such sidewalks "are wholly subject to the control of the municipal authorities of the District of Columbia."

The rulings in these cases that the District of Columbia is responsible for the condition of the streets, "primarily" it was said in Sullivan, we think does not solve the present problem. Whatever the responsibility of the District, or indeed of Transit were there no relevant and applicable statute, Congress has legislated specifically regarding this and similar carloading platforms. They

were constructed under authority of the District of Columbia Appropriation Act of 1942, now set forth in pertinent part in the margin.[2] Thus, "the street-railway company shall after construction maintain, mark, and light the same [the streetcar loading platforms] at its expense."[3]

Transit nevertheless analogizes the situation to one created by a statute which attempts to transfer from a municipality to abutting owners the responsibility for care of public sidewalks. Cases are cited which hold that while such laws impose an obligation upon the property owner enforceable by the municipality they give rise to no tort liability to third parties. City of Rochester v. Campbell, 123 N.Y. 405, 25 N.E. 937, 10 L.R.A. 393 (1890). The argument runs, in its application to our case, that since there already existed an obligation to the public on the part of the District of Columbia, the purpose of Congress could have been only to require Transit to bear the expense of maintaining, marking and lighting the platforms, without, however, being required to assume responsibility to third persons growing out of its failure to perform the duty this imposed. Reliance is placed in good part upon our decision in Radinsky v. Ellis, supra. There a law required the owner or person having charge of real estate abutting on a paved sidewalk to remove snow from the sidewalk. The question was whether a pedestrian injured as a result of a failure of the owner to remove the snow as required by the law could hold the owner responsible. The court answered in the negative, saying:

> "Enactments of this kind are generally regarded as legislative efforts to require abutting property owners

2. "a permanent type of platform may be constructed from appropriations contained in this Act for street improvements when plans and locations thereof are approved by the Public Utilities Commission and the Director of Vehicles and Traffic:
"*Provided further*, That the street-railway company shall after construction

maintain, mark, and light the same at its expense * * *."
55 Stat. 528 (1941). And see 70 Stat. 447 (1956).

3. There is no dispute that Transit is now, by succession, "the street-railway company" within the terms of this proviso. 70 Stat. 598, 603 (1956).

to aid in the performance of a municipal duty. It is held by the weight of authority that an individual does not have a cause of action against one who neglects to aid the municipality in meeting its obligations. Since it seems to us to be based on sound principle, we adopt that holding." 83 U.S.App.D.C. at 173, 167 F.2d at 746.

We think Radinsky is distinguishable, and that it should not be extended to include the situation now presented. The abutting owner in Radinsky had no special relation to the sidewalk except proximity. The sidewalk was for the use of everyone alike. Due to proximity, however, it was feasible for the legislature to call upon the abutting owner to assist the municipality in snow removal, a well-nigh impossible task for the municipality alone to perform promptly throughout the snow area. Moreover, snow is seasonal and occasional in this City. It creates a sort of emergency which may reasonably lead the legislature to enlist the assistance of the abutting owners, without the law of tort intervening to make such owners responsible to those who as members of the public use the sidewalks.

The situation with respect to the car-loading platforms is significantly different. While they are in the streets, and the municipality has responsibility for the care of the streets, the platforms are not the streets. They are built above the level of the pavement for the special, all-year-around use of those members of the public who are customers of Transit. The structures have a special relationship to Transit over and above that which a snow-covered sidewalk has to an abutting property owner. They have been constructed at public expense for the safety and convenience of Transit's customers. By the same token they are facilities for the special convenience and benefit of Transit, which holds an exclusive franchise for the transportation of the persons boarding and alighting from Transit with the aid of these facilities.

In the Act imposing upon Transit the duty of maintaining, marking and lighting the platforms Congress did not in terms refer to the question of tort liability to those who use the streets. But from the duty imposed the law must draw a conclusion either for or against such liability. Either a legal consequence to third persons, for failure to perform the duty, is or is not to be attributed to the statute. One or the other conclusion must be drawn. Transit says that if fault occurs the responsibility remains that of the District alone because the District is responsible for care of the streets. Appellants say Transit is no less chargeable with fault, should it appear, because of the requirement of the statute that Transit shall maintain, mark and light the platforms. To hold with Transit would be to permit a general common law principle which developed in and is applicable to very different circumstances to outweigh the normal effect of a specific statutory provision applicable to a particular situation. Persons injured as a result of the failure of a street railway to discharge a duty of repair imposed by ordinance or franchise have been held to have a cause of action against the street railway for breach of such requirement. See, e. g., Fowler v. Chicago Rys., 285 Ill. 196, 120 N.E. 635 (1918); Pollock v. Wheeling Traction Co., 83 W.Va. 768, 99 S.E. 267 (1919). To read into Congress' language an intention on its part that Transit was only to assist the District to perform a duty the latter already had, would be to read too narrowly. The statute requires Transit not only to bear the expense but affirmatively to maintain, mark and light the platforms after their construction at public expense, though we think the general character of the maintainance, marking and lighting is subject to the approval of the municipal authorities.

These structures give rise to special hazards, and to additional obligations for their maintenance, marking and lighting. The duty in that regard placed by Congress upon Transit should not be so construed as to rule out the applica-

tion to Transit of the law of torts in respect of its duty.*

Since the judgments were entered on the erroneous theory that, even were Transit's failure to comply with the Act of Congress a proximate cause of the death and injuries, Transit could not as matter of law be liable, the judgments will be reversed and the cases remanded for further proceedings consistent with this opinion. We intimate no views as to what the evidence may show as to the cause of the accident.

Reversed and remanded.

DANAHER, Circuit Judge (concurring).

For some reason not shown on this record, the District of Columbia was not named a party[1] to this action, despite the fact that the location and construction of loading platforms were within its competence and had been undertaken by it. Ordinarily, it may be assumed, the District should be liable for its failure safely to maintain its highways, whether or not a portion thereof be raised above the surrounding traveled surface. The loading platforms served pedestrians who sought to board streetcars.

In respect to the situation presented here, the legislative history discloses that until fiscal 1940 the District was prohibited from using highway funds to construct loading platforms. The hearings on H.R. 5610 before a subcommittee of the Senate Committee on Appropriations, 76th Cong., 1st Sess. (1939), reflect the testimony of several witnesses who urged that Congress permit the Dis-

trict to charge against the highway fund the cost of the installation of permanent loading platforms. Various spokesmen made clear their opinion that it was not legally possible for the Public Utilities Commission to compel the streetcar company to install the platforms, and the Congress was urged to make it possible that the cost be shared equitably between "the streetcar-riding public and the automobile-riding public."[2] Mr. George E. Keneipp, speaking for the Keystone Automobile Club, argued that the law, as it then stood, unwisely placed what should be regarded as a public burden on a private concern which had been unable to cope with the demand for platforms superior in utility, safety, and appearance to the previously constructed, unsightly, poorly illuminated wooden platforms which had been responsible for many accidents.[3] Congress resolved the problem by providing that the plans and locations of permanent loading installations be approved by the Public Utilities Commission and the Director of Vehicles and Traffic, with the proviso that, after construction of the platforms, the street railway company be required to "maintain, mark and light the same at its expense."[4]

It seems clear that the division of responsibility between the District and the street railway company was meaningful, as the loading platforms served a bifurcated public need. But it does not appear who was to decide what particular platforms should be lighted, or in just what way they were to be marked, or to what extent maintenance devolved upon

---

*Webster v. Capital Transit Co., supra, is not opposed to the position we take. The accident there was not in any way attributable to a failure to comply with the maintenance, marking, or lighting requirements of an Act of Congress.

1. Cf. Adams v. Kansas City, 266 S.W.2d 771, 773 (Mo.App.1954).

2. It is clear that the relief of traffic congestion was a factor in the thinking of those concerned with the problem in view of the requirement that automobiles come to a stop behind standing streetcars. Safety of transit riders would seem to

have been no less important. Hearings on H.R. 5610 Before a Subcommittee of the Senate Committee on Appropriations, 76th Cong., 1st Sess. 469–74, 752–53. (1939).

3. Hearings, supra note 2, at 757–58.

4. District of Columbia Appropriations Act, 1942, 55 Stat. 528. The Appropriations Act of 1940, unlike that of 1942, provided in pertinent part that the street railway company "shall pay the cost of maintenance, marking, and lighting after construction." 53 Stat. 1033 (1939).

the street railway company. That the streetcar company owed some duty in such respects and to some extent would seem to be beyond question in light of the statute. Whether performance of that duty was to be deemed a safety measure for the benefit of the railway company passengers waiting to board a public conveyance or whether it ran also to vehicular traffic seems not to have been the subject of congressional inquiry. It would appear that, depending upon the location of a particular loading platform with respect to lighting conditions, volume of traffic and similar considerations, a question of fact may arise when the street railway company is charged with failure to perform such duty as might devolve upon it by virtue of circumstances in a particular situation.

It follows, in my view, the case should not have been dismissed upon the appellants' opening statement. I therefore join my colleagues in reversing.